## SOUTH CAROLINA ET AL. *v.* CATAWBA INDIAN TRIBE, INC.

No. 84–782.   Argued December 12, 1985—Decided June 2, 1986

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which MARSHALL and O'CONNOR, JJ., joined, *post*, p. 511.

*James D. St. Clair* argued the cause for petitioners. With him on the briefs were *James L. Quarles III, William F. Lee, T. Travis Medlock,* Attorney General of South Carolina, *Kenneth P. Woodington,* Assistant Attorney General, *John C. Christie, Jr., J. William Hayton, Stephen J. Landes, Lucinda O. McConathy, J. D. Todd, Jr., Michael J. Giese, Dan M. Byrd, Jr.,* and *Mitchell K. Byrd.*

*Don B. Miller* argued the cause for respondent. With him on the brief were *Jean H. Toal* and *Robert M. Jones.**

JUSTICE STEVENS delivered the opinion of the Court.

At issue in this litigation is the right to possession of a "Tract of Land of Fifteen Miles square" described in a 1763 treaty between the King of England and the Catawba Head Men and Warriors.[1] The tract, comprising 144,000 acres and 225 square miles, is located near the northern border of South Carolina; some 27,000 persons now claim title to different parcels within the tract. The specific question presented to us is whether the State's statute of limitations applies to the Tribe's claim. The answer depends on an interpretation of a statute enacted by Congress in 1959 to authorize a division of Catawba tribal assets. See 25 U. S. C. §§ 931–938.

---

*Solicitor General Lee, Assistant Attorney General Habicht, Edwin S. Kneedler, Jacques B. Gelin,* and *Arthur E. Gowran* filed a brief for the United States as *amicus curiae.*

[1] The 1763 Treaty of Fort Augusta was entered into by the Catawbas and British and colonial officials, and provides, in relevant part:

"And We the Catawba Head Men and Warriors in Confirmation of an Agreement heretofore entered into with the White People declare that we will remain satisfied with the Tract of Land of Fifteen Miles square a Survey of which by our consent and at our request has been already begun and the respective Governors and Superintendant on their Parts promise and engage that the aforesaid survey shall be compleated and that the Catawbas shall not in any respect be molested by any of the King's subjects within the said Lines but shall be indulged in the usual Manner of hunting Elsewhere." XI Colonial Records of North Carolina 201–202 (1763), reprinted in App. 35.

We hold that the State's statute applies, but we do not reach the question whether it bars the Tribe's claim.

Simply stated, the Tribe[2] claims that it had undisputed ownership and possession of the land before the first Nonintercourse Act was passed by Congress in 1790;[3] that the Nonintercourse Act prohibited any conveyance of tribal land without the consent of the United States; and that the United States never gave its consent to a conveyance of this land. Accordingly, the Tribe's purported conveyance to South Carolina in 1840 is null and void. Among the defenses asserted by petitioners[4] is the contention that, even if the Tribe's claim was valid before passage and enactment of the Catawba Division of Assets Act, § 5 of the Act made the state statute of limitations applicable to the claim. Because that is the only contention that we review, it is not necessary to describe much of the historical material in the record.

## I

In 1760 and 1763, the Tribe surrendered to Great Britain its aboriginal territory in what is now North and South Carolina in return for the right to settle permanently on the "Tract of Land of Fifteen Miles square" that is now at issue.

---

[2] Respondent, Catawba Indian Tribe, Inc., is a nonprofit corporation organized under the laws of South Carolina in 1975. Like the District Court and the Court of Appeals, we assume that respondent is the successor in interest of the Catawba Indian Tribe of South Carolina. For convenience, we refer to respondent as the "Tribe" throughout this opinion.

[3] See Act of July 22, 1790, ch. 33, § 4, 1 Stat. 138. The Act, now codified at 25 U. S. C. § 177, states in relevant part:

"No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."

[4] Petitioners include the State of South Carolina and approximately 76 other parties who are named as defendants in the complaint; they were sued as representatives of a class that was alleged to consist of the approximately 27,000 persons who claim an interest in the disputed land.

For purposes of this summary judgment motion, it is not disputed that the Tribe retained title to the land when the Nonintercourse Acts were passed.

By 1840, the Tribe had leased most, if not all, of the land described in the 1763 treaty to white settlers. In 1840, the Tribe conveyed its interest in the "Tract of Land of Fifteen Miles square" to the State of South Carolina by entering into the "Treaty of Nation Ford." In that treaty, the State agreed, in return for the "Tract," to spend $5,000 to acquire a new reservation, to pay the Tribe $2,500 in advance, and to make nine annual payments of $1,500 in the ensuing years. In 1842, the State purchased a 630-acre tract as a new reservation for the Tribe, which then apparently had a membership of about 450 persons.[5] This land is still held in trust for the Tribe by South Carolina.

The Tribe contends that the State did not perform its obligations under the treaty—it delayed the purchase of the new reservation for over 2½ years; it then spent only $2,000 instead of $5,000 to purchase the new land; and it was not actually "new" land because it was located within the original 144,000-acre tract. Still more importantly, as noted, the Tribe maintains that this entire transaction was void because the United States did not consent to the conveyance as required by the Nonintercourse Act.

At various times during the period between 1900 and 1943, leaders of the Tribe applied to the State for citizenship and for a "final settlement of all their claims against the State."[6] Petitioners argue that these claims merely sought full performance of the State's obligations under the 1840 treaty, but, for purposes of our decision, we accept the Tribe's position that it was then asserting a claim under the Nonintercourse Acts and thus challenging the treaty itself. In any

---

[5] An 1825 War Department chart indicated that the Catawbas totaled 450 persons. 2 American State Papers 545 (1925).

[6] See 1920 S. C. Acts 1700, Joint Res. No. 904, § 1.

event, both state officials and representatives of the Federal Government took an interest in the plight of the Tribe.[7]

In response to this concern, on December 14, 1943, the Tribe, the State, and the Office of Indian Affairs of the Department of the Interior entered into a Memorandum of Understanding which was intended to provide relief for the Tribe, but which. did not require the Tribe to release its claims against the State.[8] Pursuant to that agreement, the State purchased 3,434 acres of land at a cost of $70,000 and conveyed it to the United States to be held in trust for the Tribe.[9] The Federal Government agreed to make annual contributions of available sums for the welfare of the Tribe and to assist the Tribe with education, medical benefits, and economic development. For its part, the Tribe agreed to conduct its affairs on the basis of the Federal Government's recommendations; it thereafter adopted a Constitution ap-

---

[7] In 1930, a Subcommittee of the Senate Committee on Indian Affairs held hearings in Rock Hill, South Carolina, which is located in the 144,000-acre tract. Senator Thomas of Oklahoma wrote that the "subcommittee . . . found some hundred and seventy-five remnants of this band located on a tract of practically barren rock and gradually starving to death." Division of Tribal Assets of Catawba Indian Tribe, Hearings on H. R. 6128, before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 86th Cong., 1st Sess. (unpublished), Insert 5, at 3 (Minutes of State and Federal Conference, Oct. 21, 1958) (6 Record Ex. 56), quoting Feb. 10, 1932, letter, Senator Thomas to Commissioner Rhoads.

[8] Preliminary drafts of the Memorandum of Understanding contained a provision extinguishing the Tribe's reservation claim (6 Record Ex. 49), but that provision was deleted. The Solicitor of the Department of the Interior emphasized that the agreement should not use "a contract under the Johnson-O'Malley Act in order to deprive the Indian tribe of claims which it might be able to enforce in the courts." United States Department of the Interior, Office of the Solicitor, Memorandum for the Commissioner of Indian Affairs. *Id.*, Ex. 50, p. 3.

[9] The State also agreed to appropriate at least $9,500 annually for three years for the benefit of the Tribe and to extend to Catawbas the rights and privileges of all citizens, including admission to public schools. *Ibid.*

proved by the Secretary of the Interior pursuant to the Indian Reorganization Act, 25 U. S. C. § 476.

In 1953, Congress decided to make a basic change in its policies concerning Indian affairs. The passage of House Concurrent Resolution 108 on August 1, 1953,[10] marked the beginning of the "termination era"—a period that continued into the mid-1960's, in which the Federal Government endeavored to terminate its supervisory responsibilities for Indian tribes.[11] Pursuant to that policy, the Federal Government identified the Catawba Tribe as a likely candidate for the withdrawal of federal services.[12] Moreover, members of

[10] That Resolution declared: "[I]t is the policy of Congress, as rapidly as possible, to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States, to end their status as wards of the United States, and to grant them all of the rights and prerogatives pertaining to American citizenship." H. R. Con. Res. 108, 83d Cong., 1st Sess. (1953), 67 Stat. B132.

[11] According to one compilation, between 1954 and 1962, Congress passed 12 separate "Termination Acts," the 11th of which was the Catawba Act. See F. Prucha, The Great Father 1048 (1984). The termination policy has been criticized by various commentators. See, e. g., Cornell, The New Indian Politics, 10 Wilson Q. 113, 121 (1986); F. Prucha, supra, at 1046–1059; Wilkinson & Biggs, The Evolution of the Termination Policy, 5 American Indian L. Rev. 139 (1977); Preloznik & Felsenthal, The Menominee Struggle to Maintain Their Tribal Assets and Protect Their Treaty Rights Following Termination, 51 N. D. L. Rev. 53 (1975). The ultimate legislative wisdom of the termination policy is, of course, not before the Court.

[12] In September 1954, a House Study Subcommittee on Indian Affairs reported that the Catawba Tribe was one of the groups able to take responsibility for their affairs and therefore was ready for termination of federal services. H. R. Rep. No. 2680, 83d Cong., 2d Sess., 2–3 (1954). In contrast to the report made by Senator Thomas in 1930, n. 7, supra, the Reports accompanying the Act concluded that the Catawbas had been able to merge into the general community and had been able to attain an economic position comparable to that of non-Indians. See S. Rep. No. 863, 86th Cong., 1st Sess., 3 (1959) ("The Catawba Indians have advanced economically . . . during the past 14 years, and have now reached a position that is comparable to their non-Indian neighbors"); H. R. Rep. No. 910, 86th Cong., 1st Sess., 2 (1959) (same). Most adult male Catawbas were

the Tribe desired an end to federal restrictions on alienation of their lands in order to facilitate financing for homes and farm operations.[13] Accordingly, after discussions with representatives of the Bureau of Indian Affairs in which leaders of the Tribe were assured that any claim they had against the State would not be jeopardized by legislation terminating federal services, the Tribe adopted a resolution supporting such legislation and authorizing a distribution of tribal assets to the members of the Tribe.[14] After receiving advice that the Tribe supported legislation authorizing the disposal of the tribal assets and terminating federal responsibility for the Tribe and its individual members, Congress enacted the Catawba Indian Tribe Division of Assets Act, 73 Stat. 592, 25 U. S. C. §§ 931–938. The Act provides for the preparation of a tribal membership roll, § 931; the tribal council's designation of sites for church, park, playground, and cemetery purposes, § 933(b); and the division of remaining assets among the enrolled members of the Tribe, § 933(f). The Act also provides for the revocation of the Tribe's Constitution and the termination of federal services for the Tribe, § 935. It explicitly states that state laws shall apply to members of the Tribe in the same manner that they apply to non-Indians. *Ibid.* Pursuant to that Act, the 3,434-acre reservation that had been acquired as a result of the 1943 Memorandum of Understanding was distributed to the members of the Tribe; the Secretary of the Interior revoked the Tribe's Constitution, effective July 1, 1962.

---

employed at the time: 47% were in industry, 20% in skilled labor, 7% in the Armed Services, 15% in odd jobs, 5% retired, and 6% on the welfare rolls. S. Rep., at 4; H. R. Rep., at 5.

[13] See 105 Cong. Rec. 5462 (1959) (statement of Rep. Hemphill); App. 102.

[14] The resolution adopted at the meeting of the Tribe on January 3, 1959, expressly noted that "nothing in this legislation shall affect the status of any claim against the State of South Carolina by the Catawba Tribe." *Id.*, at 103.

In 1980, the Tribe commenced this action seeking possession of the 225-square-mile tract and trespass damages for the period of its dispossession. All of the District Judges for the District of South Carolina recused themselves, and Judge Willson of the Western District of Pennsylvania was designated to try the case. After the development of a substantial record of uncontested facts, Judge Willson granted petitioners' motion for summary judgment. His order of dismissal was initially reversed by a panel of the Court of Appeals for the Fourth Circuit, 718 F. 2d 1291 (1983); sitting en banc, the full Court of Appeals adopted the panel's opinion. 740 F. 2d 305 (1984). Because of the importance of the case, we requested the views of the Solicitor General of the United States and granted certiorari, 471 U. S. 1134 (1985). We now reverse.

## II

Section 5 of the Catawba Act is central to this dispute. As currently codified, it provides:

> "The constitution of the tribe adopted pursuant to sections 461, 462, 463, 464, 465, 466 to 470, 471 to 473, 474, 475, 476 to 478, and 479 of this title shall be revoked by the Secretary. Thereafter, the tribe and its members shall not be entitled to any of the special services performed by the United States for Indians because of their status as Indians, all statutes of the United States that affect Indians because of their status as Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction. Nothing in this subchapter, however, shall affect the status of such persons as citizens of the United States." 25 U. S. C. § 935.

This provision establishes two principles in unmistakably clear language. First, the special federal services and statutory protections for Indians are no longer applicable to the

Catawba Tribe and its members. Second, state laws apply to the Catawba Tribe and its members in precisely the same fashion that they apply to others.

The Court of Appeals disagreed with this reading of the Act. For it concluded that the word "them" in the second sentence of § 5 could refer to the individual Indians who are members of the Tribe and not encompass the Tribe itself. Relying on the canon that doubtful expressions of legislative intent must be resolved in favor of the Indians,[15] it thus held that the language in § 5 about the inapplicability of federal Indian statutes and the applicability of state laws did not reach the Tribe itself.

The canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress.[16] It seems clear to us that the antecedent of the words "them" and "their" in the second sentence of § 5 is the compound subject of the first clause in the sentence, namely, "the tribe and its members." To read the provision otherwise is to give it a contorted construction that abruptly divorces the first clause from the second and the third, and that conflicts with the central purpose

---

[15] *DeCoteau* v. *District County Court*, 420 U. S. 425, 444 (1975); *Antoine* v. *Washington*, 420 U. S. 194, 199–200 (1975); *Mattz* v. *Arnett*, 412 U. S. 481, 504–505 (1973).

[16] See *Oregon Dept. of Fish and Wildlife* v. *Klamath Indian Tribe*, 473 U. S. 753, 774 (1985) ("[E]ven though 'legal ambiguities are resolved to the benefit of the Indians,' *DeCoteau* v. *District County Court*, 420 U. S. 425, 447 (1975), courts cannot ignore plain language that, viewed in historical context and given a 'fair appraisal,' *Washington* v. *Washington Commercial Passenger Fishing Vessel Assn.*, 443 U. S. [658, 673 (1979)], clearly runs counter to a tribe's later claims"); *Rice* v. *Rehner*, 463 U. S. 713, 732 (1983) (canon of construction regarding certain Indian claims should not be applied "when application would be tantamount to a formalistic disregard of congressional intent"); *Andrus* v. *Glover Construction Co.*, 446 U. S. 608, 618–619 (1980); *DeCoteau* v. *District County Court*, 420 U. S., at 447 ("A canon of construction is not a license to disregard clear expressions of tribal and congressional intent").

and philosophy of the Termination Act. According the statutory language its ordinary meaning, moreover, is reinforced by the fact that the first sentence in the section provides for a revocation of the Tribe's Constitution. It would be most incongruous to preserve special protections for a tribe whose constitution has been revoked while withdrawing protection for individual members of that tribe.[17]

Without special federal protection for the Tribe, the state statute of limitations should apply to its claim in this case. For it is well established that federal claims are subject to state statutes of limitations unless there is a federal statute of limitations or a conflict with federal policy.[18] Although federal policy may preclude the ordinary applicability of a state statute of limitations for this type of action in the absence of a specific congressional enactment to the contrary, *County of Oneida* v. *Oneida Indian Nation*, 470 U. S. 226. (1985), the Catawba Act clearly suffices to reestablish the usual principle regarding the applicability of the state statute of limitations. In striking contrast to the situation in

---

[17] Respondent argues that the scope of the Act was merely to terminate the specific federal services arising from the 1943 Memorandum of Understanding. Such a limited interpretation cannot be reconciled with the broader language of the Act ("The tribe and its members shall not be entitled to *any* of the special services performed by the United States for Indians because of their status as Indians"; "*all* statutes of the United States that affect Indians because of their status as Indians shall be inapplicable to them"; "the laws of the several states shall apply to them *in the same manner* they apply to other persons or citizens within their jurisdiction") (emphasis added).

[18] See, *e. g.*, *Wilson* v. *Garcia*, 471 U. S. 261, 266–267 (1985); *Board of Regents* v. *Tomanio*, 446 U. S. 478, 483–484 (1980); *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 462 (1975); *Auto Workers* v. *Hoosier Cardinal Corp.*, 383 U. S. 696, 703–704 (1966); *Cope* v. *Anderson*, 331 U. S. 461, 463 (1947); *Rawlings* v. *Ray*, 312 U. S. 96, 97 (1941); *O'Sullivan* v. *Felix*, 233 U. S. 318, 322–323 (1914); *Chattanooga Foundry & Pipe Works* v. *Atlanta*, 203 U. S. 390, 397–398 (1906); *McClaine* v. *Rankin*, 197 U. S. 154, 158 (1905); *Campbell* v. *Haverhill*, 155 U. S. 610, 617 (1895); *McCluny* v. *Silliman*, 3 Pet. 270, 277 (1830).

*County of Oneida,* the Catawba Act represents an explicit redefinition of the relationship between the Federal Government and the Catawbas; an intentional termination of the special federal protection for the Tribe and its members; and a plain statement that state law applies to the Catawbas as to all "other persons or citizens."

That the state statute of limitations applies as a consequence of terminating special federal protections is also supported by the significance we have accorded congressional action redefining the federal relationship with particular Indians. We have long recognized that, when Congress removes restraints on alienation by Indians, state laws are fully applicable to subsequent claims.[19] Similarly, we have emphasized that Termination Acts subject members of the terminated tribe to "the full sweep of state laws and state

---

[19] See, *e. g.*, *Larkin* v. *Paugh,* 276 U. S. 431, 439 (1928) ("With the issue of the patent, the title not only passed from the United States but the prior trust and the incidental restrictions against alienation were terminated. This put an end to the authority theretofore possessed by the Secretary of the Interior by reason of the trust and restriction—so that thereafter all questions pertaining to the title were subject to examination and determination by the courts, appropriately those in Nebraska, the land being there"); *Dickson* v. *Luck Land Co.,* 242 U. S. 371, 375 (1917) ("With those restrictions [of Congress] entirely removed and the fee simple issued it would seem that the situation was one in which all questions pertaining to the disposal of the lands naturally would fall within the scope and operation of the laws of the State"); *United States* v. *Waller,* 243 U. S. 452, 461–462 (1917) ("We cannot escape the conviction that the plain language of this act evidences the intent and purpose of Congress to make such lands allotted to mixed-blood Indians subject to alienation with all the incidents and rights which inhere in full ownership in persons of full capacity"); *Schrimpscher* v. *Stockton,* 183 U. S. 290, 296 (1902) (after a treaty removed restraints from alienation of land by certain Wyandotte Indians, state statute of limitations ran against Indians, even though Indians later asserted claim of a prior federal treaty violation; after removal of restraints on alienation, the Indian's heirs "were chargeable with the same diligence in beginning an action for their recovery as other persons having title to lands").

taxation."[20]   These principles reflect an understanding that congressional action to remove restraints on alienation and other federal protections represents a fundamental change in federal policy with respect to the Indians who are the subject of the particular legislation.

The Court of Appeals found support for its conclusion about the nonapplicability of the state statute of limitations in § 6 of the Catawba Act, which provides that nothing in the statute affects the rights of the Tribe under the laws of South Carolina.[21]   The thrust of the Court of Appeals' reasoning was that, if a state law was inapplicable to the Tribe or its members before the effective date of the Act, its application after the effective date necessarily violates § 6.   But such a reading contradicts the plain meaning of § 5's reference to the applicability of state laws.   In our view § 6 was merely intended to remove federal obstacles to the ordinary application of state law.   Section 6 cannot be read to preserve, of its

---

[20] *Bryan* v. *Itasca County*, 426 U. S. 373, 389 (1976).   See also *United States* v. *Antelope*, 430 U. S. 641, 647, n. 7 (1977) ("[M]embers of tribes whose official status has been terminated by congressional enactment are no longer subject, by virtue of their status, to federal criminal jurisdiction under the Major Crimes Act"); *Affiliated Ute Citizens* v. *United States*, 406 U. S. 128 (1972) (terminated members of Tribe must bring action to invalidate allegedly fraudulent conveyance under same laws as other citizens).

As the Court of Appeals noted, in *Menominee Tribe* v. *United States*, 391 U. S. 404 (1968), the Court concluded that the Menominee Termination Act did not terminate the Tribe's hunting and fishing rights.   The Court emphasized that the Termination Act must be read *in pari materia* with an Act passed in the same Congress that preserved hunting and fishing rights.   *Id.*, at 411.   In this case, of course, there is no similar contemporaneous statute.   Moreover, in *Menominee*, the Court was concerned about a "backhanded" abrogation of treaty rights, *id.*, at 412; no comparable abrogation is at issue here.

[21] As currently codified, § 6 provides:

"Nothing in this subchapter shall affect the rights, privileges, or obligations of the tribe and its members under the laws of South Carolina." 25 U. S. C. § 936.

own force, a federal tribal immunity from otherwise applicable state law without defeating a basic purpose of the Act and negating explicit language in § 5.[22] Most fundamentally, § 6 simply does not speak to the explicit redefinition of the federal relationship with the Catawbas that is the basis for the applicability of the state statute of limitations.

Finally, the Court of Appeals relied heavily on the assurance to the Tribe that the status of any claim against South Carolina would not be affected by the legislation.[23] Even assuming that the legislative provisions are sufficiently ambiguous to warrant reliance on the legislative history, we believe that the Court of Appeals misconceived the import of this assurance. We do not accept petitioners' argument that the Catawba Act immediately extinguished any claim that the Tribe had before the statute became effective. Rather, we assume that the status of the claim remained exactly the same immediately before and immediately after the effective date of the Act, but that the Tribe thereafter had an obligation to proceed to assert its claim in a timely manner as would any other person or citizen within the State's jurisdiction. As a result, unlike the Court of Appeals, we perceive no contradiction between the applicability of the state statute of limitations and the assurance that the status of any state claims would not be affected by the Act.

We thus conclude that the explicit redefinition of the federal relationship reflected in the clear language of the Ca-

---

[22] It is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *Colautti* v. *Franklin*, 439 U. S. 379, 392 (1979). See also *Mountain States Tel. & Tel. Co.* v. *Pueblo of Santa Ana*, 472 U. S. 237, 249 (1985); *United States* v. *Menasche*, 348 U. S. 528, 538–539 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' *Montclair* v. *Ramsdell*, 107 U. S. 147, 152, rather than to emasculate an entire section").

[23] See 718 F. 2d 1291, 1296 (1983) (quoting Bureau of Indian Affairs official's assurance that " 'any claim the Catawbas had against the State would not be jeopardized by carrying out a program with the Federal Government' ").

tawba Act requires the application of the state statute of limitations to the Tribe's claim.

## III

The District Court held that respondent's claim is barred by the South Carolina statute of limitations. The Court of Appeals' construction of the 1959 federal statute made it unnecessary for that court to review the District Court's interpretation of state law. Because the Court of Appeals is in a better position to evaluate such an issue of state law than we are,[24] we remand the case to that court for consideration of this issue.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL and JUSTICE O'CONNOR join, dissenting.

The Catawba Indian Tribe Division of Assets Act, 73 Stat. 592, 25 U. S. C. § 931 *et seq.*, was passed by Congress in 1959 to divide up the Tribe's federally supervised reservation so that individual Catawbas could sell or mortgage their allotments. The Court today concludes that the Act also had the incidental effect of applying a South Carolina statute of limitations to the Catawbas' pre-existing and longstanding claim to lands the State purported to purchase from the Tribe in 1840. I feel this interpretation cannot be reconciled with the language of the Act under this Court's traditional approach to statutes regulating Indian affairs. I therefore dissent.

## I

Too often we neglect the past. Even more than other domains of law, "the intricacies and peculiarities of Indian law deman[d] an appreciation of history." Frankfurter,

---

[24] See *Pembaur* v. *Cincinnati,* 475 U. S. 469, 484–485, n. 13 (1986); *Regents of University of Michigan* v. *Ewing,* 474 U. S. 214, 224, n. 10 (1985); *Bishop* v. *Wood,* 426 U. S. 341, 345–347 (1976); *Propper* v. *Clark,* 337 U. S. 472, 486–487 (1949).

Foreword to A Jurisprudential Symposium in Memory of Felix S. Cohen, 9 Rutgers L. Rev. 355, 356 (1954).

Before the arrival of white settlers, the Catawba Indians occupied much of what is now North and South Carolina. In the 1760 Treaty of Pine Tree Hill, the Catawbas relinquished the bulk of their aboriginal territory to Great Britain in exchange for assurances that they would be allowed to live in peace on a small portion of that territory, a square of land 15 miles on each side (144,000 acres), which today surrounds and includes Rock Hill, S. C. Three years later, in the Treaty of Augusta, the Tribe again agreed to "remain satisfied with the Tract of Land of Fifteen Miles square," and the British once more promised that "the Catawba shall not in any respect be molested by any of the King's subjects within the said Lines." App. 35. It is the 144,000 acres reserved for the Catawbas in 1760 and again in 1763—"a mere token of the[ir] once large domain"—that give rise to this litigation. See J. Brown, The Catawba Indians 8 (1966) (Brown).

The historical record suggests that the Catawbas were driven to the agreements of 1760 and 1763 in large part by the colonists' repeated and continuing encroachments on tribal lands.[1] Some of the land was acquired by purchase, see, e. g., id., at 165, but in South Carolina, as elsewhere, "[f]rom the very beginning abuses marred the transfer of land titles from the Indians to individuals among the English

---

[1] In letters written in 1754 to the Catawbas and to the President of the Council of North Carolina, Governor Glen of South Carolina noted that the Catawbas repeatedly had complained about whites' settling too close to them. 6 Record, Exs. 1 and 2. In response to these complaints, Governor Glen forbade whites to settle within 30 miles of Catawba towns, *ibid.*, but that prohibition was frequently ignored. See C. Hudson, The Catawba Nation 49 (1970). For general discussions of early colonial encroachments on Catawba land, see Brown, at 163–166; P. Dammann, D. Miller, & D. Israel, A History of the Catawba Tribe and its Reservation Lands, reprinted in Settlement of the Catawba Indian Land Claims, Hearing before the House Committee on Interior and Insular Affairs on H. R. 3274, 96th Cong., 1st Sess., 135, 151–153 (1979) (Hearing).

colonists." F. Prucha, American Indian Policy in the For-
mative Years 6 (1962). Indeed, the South Carolina Pro-
vincial Council took legislative notice in a 1739 statute that
lands purchased from Indians were "generally obtained . . .
by unfair representations, fraud and circumvention, or by
making them gifts or presents of little value, by which prac-
tices, great resentments and animosities have been created
amongst the Indians toward the inhabitants of this Prov-
ince." An Act to restrain and prevent the purchasing Lands
from Indians, 1 The First Laws of the State of South Carolina
160–161 (J. Cushing ed. 1981). The 1739 statute therefore
barred the private acquisition of Indian lands without a grant
or license from the Crown or the Governor, but such steps
apparently did little to stop white encroachments on Indian
territory. See Clinton & Hotopp, Judicial Enforcement of
the Federal Restraints on Alienation of Indian Land: The Or-
igins of the Eastern Land Claims, 31 U. Maine L. Rev. 17, 21
(1979). Recognizing that "great frauds and abuses have
been committed in the purchasing lands of the Indians," the
Crown in October 1763—shortly before the signing of the
Treaty of Augusta—flatly forbade any further private pur-
chases of land reserved for Indian tribes. Proclamation of
1763, reprinted in 3 W. Washburn, The American Indian and
the United States 2135, 2138 (1973).

The United States from an early date followed a similar
policy. Since 1790, the Nonintercourse Act, now codified as
reenacted and amended at 25 U. S. C. § 177, has broadly pro-
hibited the sale of Indian land without the consent of the Fed-
eral Government. Despite this prohibition—which in 1793
was extended to include not only outright purchases but also
acquisitions of any "claim" to protected lands, see Act of Mar.
1, 1793, § 8, 1 Stat. 330—mounting pressures from settlers in
the early 19th century led the State of South Carolina to
enact a series of statutes purporting to authorize the leasing

of Catawba lands to non-Indians. Initially, the leases signed under these statutes seem to have posed little threat to the Tribe. According to B. S. Massey, who knew the Catawbas during this time and later served as South Carolina's agent to the Tribe, "[t]hey were then strong and felt themselves in their own greatness, governed by their own laws, working the best spots of their lands and leasing out the poorer portions to the white men." Report to The Governor of South Carolina on the Catawba Indians 4 (1854), reprinted in 6 Record, Ex. 11.

By the 1830's, however, nearly all of the 144,000 acres reserved for the Tribe in the Treaty of Augusta had been leased to non-Indians. This situation proved disastrous, because rents were "generally paid in old horses, old cows or bed quilts and clothes, at prices that the whites set on the articles taken." *Ibid.* The Catawbas soon were reduced to "a state of starvation and distress," *ibid.*, and they ultimately gave in to repeated efforts by the State to purchase their land. In 1840, representatives of the Tribe and the State signed the Treaty of Nation Ford. Under this "treaty"—which the United States never joined or approved—the Catawbas relinquished all their land in exchange for two promises. First, the State promised the sum of $16,000 in a series of resettlement payments. Second, the State pledged that it would purchase a new reservation "of the value of five thousand dollars," including 300 acres of "good arable lands fit for cultivation" in a thinly populated area of North or South Carolina satisfactory to the Indians. App. 38–39.[2]

---

[2] According to Massey, the Indians "were driven to" this agreement "by being surrounded by white men, [who] cheat[ed] them out of their rights, and [by] partaking of the vices of the whites and but few of their virtues." Report to The Governor of South Carolina on the Catawba Indians 5 (1854), reprinted in 6 Record, Ex. 11. The "vices" to which Massey referred may have included the consumption of alcohol; the Catawbas later charged that state representatives negotiated the treaty by setting out a whiskey barrel and tin cups and inviting the Indians to help themselves. This charge was reported to the Department of the Interior in a 1908

The South Carolina Legislature promptly provided for the transfer of title from the State to the lessees of the 144,000 acres, requiring only that the lessees reimburse the State proportionately for its advances to the Tribe. Act of Dec. 18, 1840, §3, 7 S. C. Stats. 103 (1840). Unfortunately, the State showed less enthusiasm in fulfilling its contractual obligations to the Indians. After allowing the Catawbas to wander homeless and uncompensated for 2½ years, the State reportedly spent $2,000 to buy back 630 agriculturally undesirable acres of the Catawbas' original 18th-century treaty lands as a "new" reservation for the Tribe.[3] The State continues to hold these 630 acres for the Catawbas. It is unclear from the record before us whether the Tribe ever received the resettlement payments promised by the State.

In the 146 years that have passed since the Nation Ford agreement, the Catawbas repeatedly have pressed their claim to the 144,000 acres, which they feel were taken from them illegally. In the early 1900's, the Tribe petitioned both the Federal Government and the State of South Carolina for relief, arguing that the 1840 transfer was void because the United States had not approved it. The Commissioner of Indian Affairs advised the Catawbas in 1906 and again in 1909 that the Department of the Interior would not seek relief on their behalf. He explained that the Catawbas were "state Indians" for whom the United States had no responsibility, and, consequently, that the absence of federal participation in

---

memorandum by Catawba tribal attorney Chester Howe. See Plaintiffs' Response to Defendants' Motion to Dismiss in No. 80–2050–6 (CA4) p. 23, n. 30, citing Record Group 75, National Archives Central Files 1907–1939, BIA File No. 1753–1906.

[3] See Brown, at 317, 320–322. Assuming this account is correct, the new reservation was less than one-half of one percent of the Tribe's 1763 treaty lands. The price paid by the State for the new reservation—which works out to roughly $3.17 per acre—contrasts strikingly with the price paid for the same land when purchased from the Indians 2½ years earlier—the approximate equivalent of 15 cents per acre payable in installments over 10 years.

the Treaty of Nation Ford did not void the transaction.[4]   In 1908, the South Carolina Attorney General reached the same conclusion, and advised the state legislature that the Tribe had no outstanding claim to any of the 144,000 acres.   1908 Op. S. C. Atty. Gen. 17, 18, 29–32.   The Tribe nonetheless continued to press its claim to the land.   A federal Indian agent visiting the Catawbas in December 1910, for example, was asked about the Tribe's prospects for recovering "their old reservation of 15 miles square"; he told them the Department of the Interior would not take their case into court.   6 Record, Ex. 21, pp. 11–12 (letter from C. Davis to Comm'r of Indian Affairs, Jan. 5, 1911).

The seeds of the legislation found dispositive by the Court today were planted in 1943, when the Tribe, the State of South Carolina, and the Department of the Interior concluded a Memorandum of Understanding providing for a new reservation for the Catawbas, and placing the Tribe and the new reservation under federal supervision.   Evidently concerned about the Tribe's continued grievances concerning the 1840 agreement, South Carolina sought, unsuccessfully, to include in the Memorandum a waiver of any outstanding claims the Catawbas had against the State.   *Id.*, Ex. 48 (letter from Ass't Comm'r of Indian Affairs to S. C. State Auditor, Aug. 28, 1941).   Preliminary drafts of the Memorandum included such a waiver, see *id.*, Ex. 49, p. 5, but federal officials ultimately dropped the provision because they doubted the legality of using the agreement to deprive the Indians of claims that otherwise might be enforceable in court, see App.

---

[4] 6 Record, Exs. 18, 20.   But see *United States* v. *Candelaria*, 271 U. S. 432, 442 (1926) (construing the term "Indian Tribe" in the Nonintercourse Act to refer to any "'body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory,'" quoting *Montoya* v. *United States*, 180 U. S. 261, 266 (1901); *Joint Tribal Council of Passamaquoddy Tribe* v. *Morton*, 528 F. 2d 370, 376–378 (CA1 1975) (applying Nonintercourse Act to Tribe lacking federal recognition).

43–44 (memorandum from Interior Dept. Solicitor to Comm'r of Indian Affairs, Jan. 13, 1942).

In 1958, after representatives from the Bureau of Indian Affairs suggested to the Catawbas that their financial difficulties could be alleviated by distributing the Tribe's federally supervised assets and ending federal restrictions on alienation, the Indians expressed concern about their claims against the State, but they were assured that the proposal would not jeopardize those claims. 6 Record, Ex. 53, pp. 7–8 (memorandum from program officer to Tribal Programs Branch Chief, Jan. 30, 1959) (quoted by the Court, *ante*, at 510, n. 23). The Tribe then adopted a resolution calling on its Congressman, Robert Hemphill, to introduce and secure passage of legislation to remove restraints on alienation and to distribute tribal assets; the resolution specifically requested, however, that "nothing in this legislation shall affect the status of any claim against the State of South Carolina by the Catawba Tribe." App. 103.

Representative Hemphill asked the Bureau of Indian Affairs to draft legislation "to accomplish the desires set forth in the Resolution." *Id.*, at 50. He then presented the draft bill to the Catawbas and told them that it had been "drawn up to carry out the intent of the resolution." *Id.*, at 111. After a majority of the Tribe expressed approval, Representative Hemphill introduced the bill in Congress, explaining that the Tribe had given its consent. See 105 Cong. Rec. 5462 (1959). The result was the 1959 Division of Assets Act, which the Court today concludes may bar the Tribe from pursuing its claim to the lands reserved for it in 1760 and 1763.

In the 1970's, spurred by favorable legal rulings elsewhere in the country, Catawba leaders renewed their request to the Department of the Interior to seek relief for the Tribe. In 1977, the Solicitor of the Department concluded that the rebuffs given the Catawbas in 1906 and 1909 had been legally unjustified, and that the Tribe could establish a prima facie claim to the 144,000 acres. He further concluded that the

Division of Assets Act operated prospectively only, and did not affect pre-existing rights. Accordingly, the Solicitor formally requested the Department of Justice to institute legal action on behalf of the Catawbas and to support the settlement discussions that the Tribe already had initiated with South Carolina officials. See App. to Brief in Opposition 3a. The litigation request was later withdrawn in an effort to emphasize that the Interior Department favored a negotiated settlement if at all possible, and settlement legislation backed by the Tribe was introduced in Congress. See Hearing, at 15–17 (statement of Leo M. Krulitz, Solicitor of the Department of the Interior). The legislative efforts apparently proved fruitless, and in October 1980 the Tribe filed this suit.

## II

The Tribe's complaint asserts a right to possession of the reserved portion of its aboriginal territory under the Nonintercourse Act, the Federal Constitution, and the treaties of 1760 and 1763.[5] These are federal claims, see *Oneida Indian Nation* v. *County of Oneida,* 414 U. S. 661, 666–678 (1974) *(Oneida I),* and the statute of limitations is thus a matter of federal law, see *County of Oneida* v. *Oneida Indian Nation,* 470 U. S. 226, 240–244 (1985) *(Oneida II).* Where, as here, Congress has not specified a statute of limitations, federal courts generally borrow the most closely analogous limitations period under state law, but *only* if application of the state limitations period would not frustrate federal policy. See, *e. g., Wilson* v. *Garcia,* 471 U. S. 261, 266–267 (1985); *DelCostello* v. *Teamsters,* 462 U. S. 151, 158–163

---

[5] Although the complaint asks in part that the Tribe "be restored to immediate possession" of virtually the entire 144,000 acres, App. 25, the available remedies, even if the Tribe prevailed, well might be limited by equitable considerations. See *Yankton Sioux Tribe* v. *United States,* 272 U. S. 351, 357 (1926). The question currently before the Court, of course, is not whether part or all of the land claimed by the Catawbas should be given back to them, but whether the Tribe's ability to seek any judicial relief at all is governed by South Carolina's statute of limitations.

(1983); *Occidental Life Ins. Co.* v. *EEOC*, 432 U. S. 355, 367 (1977).

In *Oneida II*, the Court recognized that application of state statutes of limitations to Indian land claims generally *would* violate federal policy. The Court noted that a 1950 federal statute giving New York courts jurisdiction over most civil disputes involving Indians had been carefully crafted to exempt pre-existing land claims from the operation of a New York statute of limitations. See Act of Sept. 13, 1950, 64 Stat. 845, 25 U. S. C. § 233. Furthermore, in a later series of more general enactments imposing a federal statute of limitations on certain tort and contract actions brought anywhere in the United States by Indians or by the United States on behalf of Indians, Congress specifically excluded from the limitations period all actions "to establish the title to, or right of possession of, real or personal property." 28 U. S. C. § 2415(c).[6] The Court in *Oneida II* concluded that

---

[6] The federal statute of limitations for certain tort and contract actions brought by the United States on behalf of Indian Tribes was first adopted in 1966; the limitations period was not applied to suits brought by Indians themselves until 1982. "In 1972 and again in 1977, 1980, and 1982, as the statute of limitations was about to expire for pre-1966 claims, Congress extended the time within which the United States could bring suits on behalf of the Indians." *Oneida II*, 470 U. S., at 242. The debates over these amendments to § 2415 indicate that Congress extended the filing deadline in part to allow additional time for preparation and negotiation of tort claims for trespass damages arising from allegedly illegal expropriations of tribal lands—including the 144,000 acres claimed by the Catawbas. See, *e. g.*, 123 Cong. Rec. 22166–22167 (1977) (Rep. Cohen, discussing Catawba claim and others); *id.*, at 22168 (Rep. Walsh); *id.*, at 22170 (Rep. Hanley); 126 Cong. Rec. 5748–5749 (1980) (Rep. Holland, discussing Catawba claim); *id.*, at 5750 (Rep. Udall). Members of Congress emphasized repeatedly that Indian land claims were difficult to research, that Indians historically had lacked adequate legal assistance and administrative resources, and that the United States had not played its proper role in bringing suits on the Indians' behalf. See, *e. g.*, 123 Cong. Rec. 22170 (1977) (Rep. Collins); *id.*, at 22171 (Rep. Johnson); 126 Cong. Rec. 3289 (1980) (Sen. Cranston); *id.*, at 5745–5746 (Rep. Clausen); *id.*, at 5747 (Rep. Danielson); *id.*, at 5750 (Rep. Swift). See also 123 Cong. Rec. 22171 (1977) (Rep. Weiss) ("[A]s a

the text and legislative history of these statutes evinced a congressional belief that actions brought to enforce Indian property rights were not, and should not be, subject to filing deadlines other than those provided by federal statute. Borrowing a state statute of limitations in such a case "would be a violation of Congress' will." 470 U. S., at 244.

In determining whether the 1959 Division of Assets Act exempts the Catawbas' claim from this general principle, analysis must begin with the firmly established rule—which the Court today implicitly reaffirms, see *ante*, at 506—that ambiguities in statutes regulating Indian affairs are to be construed in the Indians' favor. See, *e. g., Oneida II*, 470 U. S., at 247–248; *Bryan* v. *Itasca County*, 426 U. S. 373, 392 (1976); *Northern Cheyenne Tribe* v. *Hollowbreast*, 425 U. S. 649, 655, n. 7 (1976); *DeCoteau* v. *District County Court*, 420 U. S. 425, 444 (1975); *United States* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339, 353–354 (1941); *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 89 (1918); *Choate* v. *Trapp*, 224 U. S. 665, 675 (1912); see generally F. Cohen, Handbook of Federal Indian Law 221–225 (1982). This rule is not simply a method of breaking ties; it reflects an altogether proper reluctance by the judiciary to assume that Congress has chosen further to disadvantage a people whom our Nation long ago reduced to a state of dependency. The rule is particularly appropriate when the statute in question was passed primarily for the benefit of the Indians, as was the 1959 Division of Assets Act. Absent "clear and plain" language to the contrary, *Santa Fe Pacific*, 314 U. S., at 353, it must be assumed that Congress did not intend to belie its

result of the numerous injustices suffered by American Indians during the last 150 years—many at the hands of the American Government—it is incumbent on the United States to give these people—our country's first inhabitants—a full chance to redress their grievances"); 126 Cong. Rec. 3287 (1980) (Sen. Melcher) (failure to extend statute of limitations could lead to "mass injustices"). Similar considerations presumably motivated Congress' decision to exempt entirely all claims for title or possession from the limitations period prescribed in § 2415.

"avowed solicitude" for the Indians, *id.*, at 354, with a "back-handed" abrogation or limitation of their rights, *Menominee Tribe* v. *United States*, 391 U. S. 404, 412 (1968).

The Court today evidently finds in § 5 of the Division of Assets Act "the clearly expressed intent of Congress," *ante,* at 506, that the Catawbas' tribal land claim was to be subject to South Carolina's statute of limitations. The Court relies largely on two provisions of § 5. The first renders inapplicable to the Catawbas all "special services performed by the United States for Indians because of their status as Indians," and "all statutes of the United States that affect Indians because of their status as Indians." The second provides that state laws shall "apply to [the Catawbas] in the same manner they apply to other persons or citizens." 25 U. S. C. § 935. Neither of these provisions, in my view, is able to bear the weight the Court places upon it.

## A

The first provision merely renders federal Indian "services" and "statutes" inapplicable to the Catawbas. I agree with the Court that this provision makes the Nonintercourse Act, along with other Indian statutes, inapplicable both to individual Catawbas and to the Tribe. See *ante,* at 505–509. But that simply means that after the Division of Assets Act went into effect, the Tribe no longer was statutorily barred from selling or leasing its land. The services-and-statutes clause of the Act does not expressly abrogate or place procedural conditions on any *pre-existing* claims the Catawbas may have had, and the broad federal policy against application of state statutes of limitations to Indian land claims is neither a "service" nor a "statute."

The majority nonetheless asserts that this Court has "long recognized that, when Congress removes restraints on alienation by Indians, state laws are fully applicable to subsequent claims." *Ante,* at 508. The cases it cites for that proposition all were decided well before the emergence during the

past 35 years of a clear congressional policy against the application of state statutes of limitations to Indian land claims. See *Oneida II*, 470 U. S., at 240–244. More importantly, all the cases cited by the majority involve lands for which patents had been issued to individual Indians, not lands alleged to remain tribal property. This Court made clear in *Oneida I* that claims arising under such patents are not federal claims at all, because, "[o]nce patent issues, the incidents of ownership are, for the most part, matters of local property law to be vindicated in local courts." 414 U. S., at 676. In this case, however, as in *Oneida I*, "the assertion of a federal controversy does not rest solely on the claim of a right to possession derived from a federal grant of title whose scope will be governed by state law. Rather, it rests on the substantial claim that federal law now protects, and has continuously protected from the time of the formation of the United States, possessory right to tribal lands, wholly apart from the application of state law principles which normally and separately protect a valid right of possession." *Id.*, at 677. Here, as in *Oneida I*, the complaint thus "asserts a present right to possession under federal law." *Id.*, at 675.

I do not see how a statute removing restraints on alienation can fairly be said to signal unambiguously a congressional intent to subject pre-existing tribal land claims arising under federal law to state statutes of limitations. But even if I agreed with the majority that the removal of restraints on alienation should trigger the application of state limitations periods, the 1959 Act lifted only *statutory* restrictions on the alienation of Catawba land, and the requirement that the Federal Government approve any transfer of the property at issue in this case did not, and does not, stem solely from any federal statute. The land set aside for the Catawbas in 1760 and 1763 was within the Tribe's aboriginal territory,[7] and

---

[7] John Stuart, the King's Superintendent of Indian Affairs, who had negotiated the Treaty of Augusta, noted in a 1772 letter to the South Carolina Governor that the 144,000 acres reserved for the Catawbas in that treaty

their claim to the land thus derives from original title[8] as well as from the 18th-century treaties.[9]  With respect to original title, at least, the Nonintercourse Act merely "'put in statutory form what was or came to be the accepted rule — that the extinguishment of Indian title required the consent of the United States.'"  *Oneida II*, 470 U. S., at 240, quoting *Oneida I*, 414 U. S., at 678.[10]

There is nothing in the 1959 legislation that indicates that Congress intended to exempt the Catawbas from this

---

were, "as well as a very considerable Extent of Country besides[,] possessed by them when the Subjects of England first Settled in this part of the World."  6 Record, Ex. 7, p. 1.

[8] See generally F. Cohen, Handbook of Federal Indian Law 486–493 (1982); Cohen, Original Indian Title, 32 Minn. L. Rev. 28 (1947); Note, Indian Title: The Rights of American Natives in Lands They Have Occupied Since Time Immemorial, 75 Colum. L. Rev. 655 (1975).

[9] This Court long has respected grants of land to Indian tribes by prior governments.  See, *e. g.*, *United States* v. *Title Insurance & Trust Co.*, 265 U. S. 472, 484 (1924), quoting *Barker* v. *Harvey*, 181 U. S. 481, 491–492 (1901) ("'There is an essential difference between the power of the United States over lands to which it has had full title, and of which it has given to an Indian tribe a temporary occupancy, and that over lands which were subjected by the action of some prior government to a right of permanent occupancy, for in the latter case the right, which is one of private property, antecedes and is superior to the title of this government, and limits necessarily its powers of disposal'"); *Mitchel* v. *United States*, 9 Pet. 711 (1835).

[10] The federal common-law rule against alienation of aboriginal title without the consent of the sovereign was recognized as early as 1823 in Chief Justice Marshall's opinion for the Court in *Johnson* v. *McIntosh*, 8 Wheat. 543, 573–574 (1823), and it is reflected in the Constitution's Indian Commerce Clause, Art. I, § 8, cl. 3, which made "Indian relations . . . the exclusive province of federal law," *Oneida II*, 470 U. S., at 234, and n. 4. See Clinton & Hotopp, Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims, 31 U. Maine L. Rev. 17, 28–29 (1979).  In *Oneida II*, the Court rejected a suggestion that Indian common-law rights to tribal lands were somehow swallowed up or pre-empted by the Nonintercourse Act; it made clear that the common law still furnishes an independent basis for legal relief.  See 470 U. S., at 236–240.

common-law protection of undistributed tribal property as well as from its statutory codification. Nor is there anything to indicate that Congress meant to abrogate the protection promised to the Tribe under the treaties of 1760 and 1763, which the Tribe claims provide an independent source of continuing federal protection. Indeed, in rejecting an argument that a similar provision of the Menominee Termination Act destroyed treaty rights to hunt and fish, this Court noted: "The use of the word 'statutes' is potent evidence that no *treaty* was in mind." *Menominee Tribe,* 391 U. S., at 412 (emphasis in original). In the same way, Congress' use in 1959 of the terms "services" and "statutes" suggests, if anything, that the Division of Assets Act was not intended to remove other sources of protection. Surely the selection of these terms provides no support for the view that Congress meant to impose new procedural requirements on preexisting tribal land claims based not only on statutory provisions, but also on treaty rights and federal common law.[11]

---

[11] The Tribe's complaint requests relief under the treaties of 1760 and 1763, the Nonintercourse Act, the Indian Commerce Clause, Art. I, § 8, cl. 3, and the constitutional prohibition against state treaties, Art. I, § 10, cl. 1. App. 24. Reading the complaint liberally "so . . . as to do substantial justice," Fed. Rule Civ. Proc. 8(f), I would conclude that the constitutional references suffice to invoke the rule that original Indian title may not be alienated without federal approval. Cf. Brief for United States as *Amicus Curiae* in *Connecticut* v. *Mohegan Tribe,* O. T. 1980, No. 80–1365, p. 7 (describing the rule as "constitutionally based"). A narrower construction of the complaint would be especially inappropriate because the Tribe adopted the United States' brief in *Mohegan Tribe* as part of its response in the District Court to the defendants' motion to dismiss, making clear that the constitutional claims raised in the complaint were to be read to embrace the common-law rule. See Plaintiff's Memorandum in Support of Motion for Leave to File Supplemental Memorandum and Supplemental Memorandum, 1 Record, Ex. 15.

Because, under my view, the Tribe's treaty claims add nothing material for present purposes to its common-law claim, I would not decide at this time whether the 1760 and 1763 treaties independently required the United States, as successor to Great Britain, to approve any sale or lease of the 144,000 acres. Why the majority finds no need to discuss this ques-

B

The second provision of the 1959 Act relied on by the Court directs that "the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction." I agree with the Court that the word "them" must be understood to refer not only to individual Catawbas, but also to the Tribe. See *ante*, at 506–507. Clearly, however, "them" does not refer to *claims* brought by the Catawbas; the term encompasses the plaintiff in this case, but not the cause of action.

This distinction is critical. The "laws of the several States" provision of the Division of Assets Act placed the Catawbas on the same footing as non-Indians with regard to the application of state law. Just as a non-Indian's action based on South Carolina law must be brought within the time specified by the State, so a state-law action brought by a Catawba—or by the Catawba Tribe—must meet the same requirement. If a non-Indian in South Carolina brings a *federal* claim, however, the limitations period is determined by federal law. The same must hold for the federal claims raised by the Catawbas in this litigation.

Of course, the real question in this case is not whether federal law governs the limitations question, but whether federal law should borrow South Carolina's period of limitations, notwithstanding the general federal policy against such borrowing in the context of Indian land claims. My point here is that this question is not answered by the statutory instruction to apply state law to the Catawbas "in the same manner" as it is applied to non-Indians. Subjecting a group of Indians to state law to the same extent as other citizens is far different from subjecting their unique federal claims to a state statute of limitations. For non-Indians as well as Indians,

---

tion, or the issue of common-law restraints on alienation, is harder to understand.

the decision whether to apply a state limitations period to a federal claim depends on whether such application is deemed contrary to federal policy. And nothing in § 5 of the Division of Assets Act unambiguously directs that, as a matter of federal policy, the Catawbas' unsettled tribal claims should be treated any differently for statute-of-limitations purposes from other tribal land claims. Indeed, there is no indication that Congress thought about such claims at all.[12]

## C

The Court does not rely exclusively on the terms of the two provisions discussed above; it also emphasizes that the Division of Assets Act as a whole represented an "explicit redefinition of the relationship between the Federal Government and the Catawbas," terminating "special federal protection" for the Tribe and its members. *Ante*, at 508; see also *ante*, at 510.[13] But if we take seriously the "eminently sound and vital canon" that all ambiguities in statutes passed for the benefit of Indians are to be construed in the Indians' favor, *Northern Cheyenne Tribe*, 425 U. S., at 655, n. 7, then surely the effect of such an "explicit redefinition" must be limited to its explicit terms. The Court recognized as much in *Menominee Tribe, supra*, when it refused to read into the Menominee Termination Act an abrogation of the Menomi-

---

[12] The Senate and House Reports both explained that the purpose of the 1959 legislation was "to distribute the bulk of the [Catawbas'] tribal assets" among the members of the Tribe. S. Rep. No. 863, 86th Cong., 1st Sess., 1 (1959); H. R. Rep. No. 910, 86th Cong., 1st Sess., 2 (1959). Each Report contained a list of the Tribe's assets; the list made no mention of the Catawbas' claim to their 18th-century treaty lands. See S. Rep. No. 863, at 3; H. R. Rep. No. 910, at 4.

[13] The majority rightly places little weight on the fact that § 5 of the 1959 Act revoked the Tribe's Constitution. The Catawbas had no tribal constitution until 1944, when they adopted one pursuant to the 1943 Memorandum of Understanding. See, *e. g.*, H. R. Rep. No. 910, 86th Cong., 1st Sess., 5 (1959). Revocation of the Constitution therefore can hardly be understood as a statement that the Tribe should cease existence or lose any pre-existing claims.

nees' treaty rights to hunt and fish. Regardless of the general thinking behind the termination policy of the 1950's, we are faced here with a particular statute, and we should not "'strain to implement [an assimilationist] policy Congress has now rejected.'" *Bryan* v. *Itasca County*, 426 U. S., at 389, n. 14, quoting *Santa Rosa Band of Indians* v. *Kings County*, 532 F. 2d 655, 663 (CA9 1975).

Such straining is particularly inappropriate in this case, where the statute in question was passed at the Indians' behest, was apparently intended to carry out the Indians' wishes, and received the Indians' support based on federal assurances that it would not "affect the status" of their claim against the State. One, of course, can distinguish formally, as the majority does, see *ante*, at 510, between preserving the "status" of the claim and preserving the claim's immunity from the state statute of limitations. But the distinction smacks of the kind of semantic trap that this Court consistently has attempted to avoid when construing governmental agreements with Indians and statutes ostensibly passed for the benefit of Indians. In cases involving Indian treaties, for example, it has long been the rule not only that doubtful expressions must be construed in the Indians' favor, but also that the entire treaty must be interpreted as the Indians would have understood it. See, *e. g., Choctaw Nation* v. *Oklahoma*, 397 U. S. 620, 631 (1970); *Jones* v. *Meehan*, 175 U. S. 1, 11 (1899); *Worcester* v. *Georgia*, 6 Pet. 515, 582 (1832).

The Catawbas were assured in unqualified terms that the 1959 legislation would not jeopardize their century-old grievance against the State of South Carolina. The Act itself said nothing about the claim, and nothing about statutes of limitations. No one told the Indians or the voting Members of Congress that the statute might someday prevent the Tribe from pursuing its claim in court. The Court nevertheless concludes today that the 1959 Act bars the Catawbas' claim if the limitations period under South Carolina law expired be-

tween the passage of the Act and the initiation of this lawsuit in 1980, and that this interpretation of the statute comports with the promises made to the Catawbas in the 1950's. I cannot agree with either conclusion. In my view, this decision breaks faith once again with the Tribe, and it does so in a way the statute does not require. Nothing in the text or legislative history of the Act evinces a congressional desire to mislead the Indians, or an understanding that the Act sometime might be construed as it is by the Court today.

## III

Apparently, there no longer are any full-blood Catawbas, and no one now speaks the Catawba language. See Charlotte Observer, Mar. 6, 1977, p. 1C, reprinted in Hearing, at 420. Of the 1,200 or so persons currently on the tribal roll, only about 5 or 10 percent live on the 630-acre reservation still held for the Tribe by the State of South Carolina.[14] The reservation itself does not differ conspicuously from other rural neighborhoods in South Carolina. Indeed, "[a]n unobservant tourist may well drive through the reservation unawares, and many do." C. Hudson, The Catawba Nation 3 (1970). For the most part, modern-day Catawbas "think and live like ordinary Americans of the Southeast." *Ibid.*

When an Indian Tribe has been assimilated and dispersed to this extent—and when, as the majority points out, thousands of people now claim interests in the Tribe's ancestral homeland, see *ante,* at 499–500, and n. 4—the Tribe's claim to that land may seem ethereal, and the manner of the Tribe's dispossession may seem of no more than historical interest. But the demands of justice do not cease simply because a wronged people grow less distinctive, or because the rights of innocent third parties must be taken into account in fash-

---

[14] See, *e. g.,* Hearing, at 20 (statement of Leo M. Krulitz, Interior Department Solicitor); *id.,* at 39 (statement of Claude Ayres, Member, Catawba Indian Nation Land Claim Committee); Proposed Catawba Indian Reservation Land Use Analysis 4 (1977), reprinted in Hearing, at 251, 258.

ioning a remedy. Today's decision seriously handicaps the Catawbas' effort to obtain even partial redress for the illegal expropriation of lands twice pledged to them, and it does so by attributing to Congress, in effect, an unarticulated intent to trick the Indians a century after the property changed hands. From any perspective, there is little to be proud of here.

Because I do not believe that Congress in 1959 expressed an unambiguous desire to encumber the Catawbas' claim to their 18th-century treaty lands, and because I agree with Justice Black that "[g]reat nations, like great men, should keep their word," *FPC* v. *Tuscarora Indian Nation,* 362 U. S. 99, 142 (1960) (dissenting opinion), I do not join the judgment of the Court.