Connon, J.
INTRODUCTION
Plaintiff Jerry Weiner, in his capacity as the Building Inspector and Zoning Officer of the town of Aquinnah, filed this action seeking to enforce the town’s Zoning By-law against the defendant Wampanoag Tribal Council of Gay Head, Inc., a federally recognized tribe of Native Americans, and its Shellfish Hatchery Corporation. This matter is before the court on the parties’ cross motions for summary judgment pursuant to Mass.R.Civ.P. 56. For the reasons discussed below, the plaintiffs motion for summary judgment is DENIED and the defendants’ cross motion for summary judgment is ALLOWED.
BACKGROUND
The following is taken from the summary judgment record. The undisputed facts, and any disputed facts viewed in the light most favorable to the non-moving party, are as follows. Plaintiff Jerry Weiner (“Weiner”) is the Building Inspector and Zoning Officer for the Town of Aquinnah, formerly known as the Town of Gay Head. Defendant Wampanoag Tribal Council of Gay Head (“the Tribe”) is a federally recognized Native American Tribe. The Tribe owns approximately 7.2 acres of coastal land known as “the Cook Lands” identified as Parcels 45 and 46 on the Aquinnah Assessor’s Map 11. The Cook Lands are at the center of the present zoning dispute.
In 1974, the Tribe, which was not yet recognized by the Secretary of the Interior as a Native American Tribe but which was incorporated under Massachusetts law, commenced litigation in the United States District Court of Massachusetts against the Town of Gay Head, claiming that certain transfers of public land in the Town violated the Indian Non-Intercourse Act. In 1983, the Tribe and the Town wished to settle this litigation and entered into an agreement dated September 8, 1983 entitled, “Joint Memorandum of Understanding Concerning Settlement of the Gay Head, Massachusetts Indian Land Claims” (“the Settlement Agreement”) which incorporated by reference a Land Plan dated September 23, 1983 (“the Land Plan”). Paragraph 3 of the Settlement Agreement provides in relevant part:
The Tribal Land Corporation shall hold the Settlement Lands, and any other land it may acquire, in *660 the same manner, and subject to the same laws, as any other Massachusetts corporation, except to the extent specifically modified by this agreement and the accompanying proposed legislation. Under no circumstances, including any future recognition of the existence of an Indian tribe in the Town of Gay Head, shall the civil or criminal jurisdiction of the Commonwealth of Massachusetts, or any of its political subdivisions, over the settlement lands, or any land owned by the Tribal Land Corporation in the Town of Gay Head, or the Commonwealth of Massachusetts, be impaired or otherwise altered, except to the extent modified in this agreement and in the accompanying proposed legislation.
Paragraph 5 of the Settlement Agreement provides in relevant part:
The Town of Gay Head shall convey the so-called Cook Lands (L. No. 395) to the Tribal Land Corporation. Such property, however, shall not be part of the Settlement Lands, and shall remain subject to taxation and foreclosure in the same manner as any other privately owned property in Gay Head. Any structure placed on this property shall be subject to all Federal, State and local laws, including Town zoning laws, State and Federal conservation laws, and ihe regulations of the Martha’s Vineyard Commission.
Finally, paragraph 11 of the Settlement Agreement provides in relevant part:
The Settlement Land shall be subject to an express federal statutory restriction against alienation. This statutory provision against alienation shall state explicitly that (a) no Indian tribe or band shall ever exercise sovereign jurisdiction as an Indian tribe other than to the extent agreed herein, over all or any part of the Settlement lands, or over any other land that may now or in the future be owned by or held in trust for, any Indian entity, but (b) the absence of such sovereignty shall not in any way prejudice Gay Head Indians in their efforts to obtain federal benefits available to Indians or to achieve recognition as a tribe.
The Land Plan provides in relevant part that the Cook Lands “will be subject to normal health and building regulations of Gay Head and the Commonwealth, as they are in force at the time in question, and to state and federal conservation laws and the regulations of the Martha’s Vineyard Commission.”
The Massachusetts Legislature enacted special legislation, Chapter 277 of the Acts of 1985, entitled “An Act to Implement the Settlement of the Gay Head Indian Land Claims” (“the State Act”) to implement the terms of the Settlement Agreement. Section 4 of the State Act provides in relevant part:
(c) The zoning and subdivision ordinances and regulations of the town of Gay Head shall not be applicable to the settlement lands except to the extent and in the manner provided in the settlement agreement. . .
(d) The zoning laws of the town of Gay Head which are currently in force shall continue to apply to the Cook lands and any changes in those zoning laws shall apply to the Cook lands only if adopted in the manner provided by the settlement agreement.
St. 1985, c. 277, 4. Section 5 of the State Act further provides:
Except as provided in this act, all laws, statutes and bylaws of the commonwealth, the town of Gay Head, and any other properly constituted legal body, shall apply to all settlement lands and any other lands owned now or at any time in the future by the Tribal council or any successor organization.
St. 1985, c. 277, 5.
In February of 1987, the Secretary of the Interior granted federal recognition of the Tribe’s existence as a Native American Tribe at 52 Federal Register 4193 (1987). On August 18, 1987, Congress passed the “Massachusetts Indian Land Claims Settlement Act,” 25 U.S.C. 1771-7H (“the Federal Act”), to implement the Settlement Agreement. Section 1771d of the Federal Act, “Purchase and Transfer of Settlement Lands,” provides in relevant part:
Any lands acquired pursuant to this section, and any other lands which are hereafter held in trust for the Wampanoag Tribal Council of Gay Head, Inc., any successor, or individual member, shall be subject to this Act, the Settlement Agreement and other applicable laws.
25 U.S.C. 1771d(c) (1987). Section 1771e, “Jurisdiction over settlement lands,” provides in relevant part:
The Wampanoag Tribal Council of Gay Head, Inc., shall not have any jurisdiction over tribal members and shall not exercise any jurisdiction over any part of the settlement lands in contravention of this subchapter, the civil regulatory and criminal laws of the Commonwealth of Massachusetts, the town of Gay Head, Massachusetts, and applicable Federal laws.
25 U.S.C. 17713(a) (1987). Finally, Section 1771g, “Applicability of State Law,” provides:
Except as otherwise expressly provided in this Act or in the State Implementing Act, the settlement lands and any other land that may now or hereafter be owned or held in trust for any Indian tribe or entity in the town of Gay Head, Massachusetts, shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance).
25 U.S.C. 1771g (1987).
*661 In 1992, pursuant to the Settlement Agreement, the Town conveyed certain Town lands, including the Cook Lands, to the United States of America to be held in trust for the Tribe. By the terms of the Deed, the conveyance of the Cook Lands was specifically made subject to the Federal Act, the State Act, the Settlement Agreement and the Land Plan.
Section IIA(3) of the Town’s Zoning By-law, which was in effect at the time of the Settlement Agreement in 1983, establishes a Coastal District by reference to a zoning map. The Cook Lands, which are bounded to the North by a tidal pond known as Menemsha Pond and are bounded to the South by an estuary stream known as Herring Creek, are located in part within the Coastal District.[2] Section VII(A) of the 1983 Zoning By-law, provides in relevant part:
This By-Law shall be enforced by the Building Inspector, acting under the Board of Selectmen. No building shall be built or altered and no use of land or building shall be begun or changed without a permit having been issued by the Building Inspector... Permits not used within a year’s time shall become void. Each application for a permit shall be accompanied by such plans, surveys, and other data as may be necessary in the opinion of the Building Inspector to insure full compliance with this By-Law.
Section 11(H)(1) of the 1983 Zoning By-law provides that:
There shall be no construction of buildings or structures within 200 feet of wetlands, waterbodies, beaches, dunes, or the crests of bluffs over 15feethigh until a special permit is obtained from the Planning Board Plan Review Committee, providing that within 100 feet of said wetlands, waterbodies, beaches, dunes or bluffs, a special permit may only be granted for a fishing related marine commercial structure.
The Tribe operates a shellfish hatchery on the Cook Lands through the defendant Wampanoag Aquinnah Shellfish Hatchery Corp. (“Hatchery”), an unincorporated entity wholly owned and controlled by the Tribe. On December 27, 1997, the Tribe filed a Notice of Intent with the Town Conservation Commission seeking permission to perform work within a wetlands area in connection with the construction of the shellfish hatchery. The Town issued an Order of Conditions for this work on January 20, 1998. On February 24, 1998, the Tribe applied to the Town for a special permit to construct a 2400 square foot shellfish hatchery within the Coastal District. The application, which did not include a pier platform or shed, was approved on March 20, 1998. However, the Hatchery did not commence construction within one year of the issuance of the special permit.
Thereafter, on April 1, 1999, the Tribe applied to the Town for a second special permit to construct the shellfish hatchery within the Coastal District. The Town granted a special permit on April 30, 1999. On May 19, 1999, the Tribe’s Tribal Council adopted a Land Use Ordinance (“the Tribal Ordinance”) to govern land use decisions on its tribal lands. The Tribal Ordinance adopted by reference the 1983 Town of Gay Head Zoning By-laws; the Wetlands Protection Act, General Laws Chapter 131, 40; the State Building Code; the Massachusetts State Environmental Code (Title V); and the Massachusetts Health Codes, General Laws Chapter 111, 31. The Tribal Ordinance created a Tribal Land Use Commission and established a permit process, but does not provide a mechanism for judicial review of permit decisions.
On August 14, 1999, the Tribe applied to Building Inspector Weiner for a building permit to construct the hatchery. This application, which did not include any accessory structures such as piers or sheds, was approved the same day. On October 5, 1999, the Tribe applied to the Massachusetts Department of Environmental Protection (“DEP”) for a Waterways License to construct a pier and shed to house equipment needed to pump sea water to the hatchery.
On October 31, 2000, the Tribe’s Associate Planner for the Natural Resources Department submitted a permit application to the Tribal Land Use Commission to place a pier and a 6 x 8 foot shed on a pre-existing concrete pad near Menemsha Pond in the Herring Creek Area so that electricity could be routed from subsurface lines into a panel in the shed. The proposed pier and shed are located on the Cook Lands within 200 feet of wetlands identified in the 1983 Town Zoning By-law. On November 15, 2000, following a public hearing, the Tribal Land Use Commission approved this permit pursuant to the Tribal Ordinance. On November 29, 2000, the DEP issued a Waterways License to the Hatchery to construct a platform for aquaculture and the conveyance of water and electricity. The license, which was recorded in the Dukes County Registry of Deeds on December 7, 2000, provides:
This License is granted upon the express condition that any and all other applicable authorizations necessitated due to the provisions hereof shall be secured by the Licensee prior to the commencement of any activity or use authorized pursuant to this License . . .
This Waterways License is granted subject to all applicable Federal, State, County, and Municipal laws, ordinances and regulations including but not limited to a valid final Order of Conditions issued pursuant to the Wetlands Protection Act, G.L.c. 131, 40.
In March of 2001, the Hatchery began construction of the shed and pier without obtaining a special permit and building permit under the Town By-law. On March 30, 2001, Wiener served the Tribe’s Chairman, Beverly Wright, as agent for the Hatchery, with a cease and desist letter. The Tribe contended that its construction activities were not subject to local permitting requirements such as 7.40.02 of the Aquinnah Zoning By-law. The Tribe did not, however, appeal the cease and desist order pursuant to the Town By-law or General Laws Chapter 40A.
*662 Thereafter, on May 1, 2001, Weiner filed this action in Superior Court seeking an injunction enjoining the Tribe from construction on the Cook Lands without a permit and a declaratory judgment of the extent to which the Tribe is subject to local laws requiring the issuance of a building permit. The parties entered into a stipulation that the Tribe would comply with the cease and desist order pending further court order.
The Tribe removed the case to the Federal District Court of Massachusetts on June 1, 2001. On July 12, 2001, the Tribe filed an answer and counterclaim alleging in Count I that Weiner’s lawsuit to enforce the Town’s Zoning By-law violates the Tribe’s federal common-law sovereign immunity, and alleging in Count II that Weiner’s lawsuit intrudes upon the Tribe’s sovereignty in violation of Article 1, Section 8 of the United States Constitution. The Tribe’s counterclaim seeks a declaration that the Tribe is immune from the Town’s cease and desist order and that the Town has non-exclusive jurisdiction over the Tribe and the Cook Lands.[3] Cross motions for summary judgment were filed in the District Court in November of 2001 and a hearing was held on March 6,2002. On September 30, 2002, the District Court (Woodlock, J.) concluded that federal subject matter jurisdiction was lacking and remanded the case back to Dukes Superior Court.
On February 12, 2003, this Court allowed the motion of abutter to the Cook Lands, UMB Bank, as Trustee of the Thomas Benton Trust u/w/o Rita P. Benson, to intervene as a plaintiff in this action. That same date, this Court also allowed the motion of the Taxpayers’ Association of Gay Head, Inc. (Aquinnah) to intervene as a plaintiff. Weiner now moves for summary judgment on his complaint. The defendants have filed a cross motion for summary judgment on the complaint and moved for summary judgment on Counts I and II of their counterclaim.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouuacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
The Tribe contends that it is entitled to judgment as a matter of law because it enjoys tribal sovereign immunity from civil suit and this Court therefore lacks jurisdiction to hear this case. It is well established that tribes of Native American people, recognized as such by the United States, are distinct, independent, political communities, retaining their original natural rights and enjoying an inherent sovereignty. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55 (1978); Wampanoag Tribe of Gay Head v. MCAD, 63 F.Sup.2d 119, 123 (D.Mass. 1999). Accordingly, as a matter of federal law, a recognized Native American tribe is immune from suit in a state court unless Congress has abrogated tribal immunity in that setting or the tribe has waived its sovereign immunity or consented to suit. C&L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 532 U.S. 411, 414 (2001); Puyallup Tribe, Inc. v. Department of Game of State of Washington, 433 U.S. 165, 172-73 (1977); United States v. United States Fidelity & Guaranty, 309 U.S. 506, 512 (1940).
An abrogation of tribal immunity cannot be implied and Congress must unequivocally express that purpose. C&L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 532 U.S. at 418; Wampanog Tribe of Gay Head v. MCAD, 63 F.Sup.2d at 123. In determining Congressional intent, statutes passed for the benefit of dependent Native American tribes are to be liberally construed, with ambiguities resolved in favor of the tribe. Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 177 (1989); Bryan v. Itasca County, 426 U.S. 373, 392 (1976); Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 691 (1st Cir.), cert. den., 513 U.S. 919 (1994). Nonetheless, this general rule does not command a determination in the face of congressionally manifested intent to the contrary, and in all cases, congressional intent must be determined by examining the face of the statute, the surrounding circumstances, and the legislative history. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 587 (1977); Rhode Island v. Narragansett Indian Tribe, 19 F.3d at 691.[4]
The plaintiff first argues that in passing the Federal Act, Congress abrogated the Tribe’s sovereign immunity with respect to suits like the present one. However, the Federal District Court of Massachusetts has examined the relevant provisions of the Federal Act and concluded that they do not constitute an unequivocal expression of intent to abrogate the Tribe’s sovereign immunity. See Wampanoag Tribe of Gay Head v. MCAD, 63 F.Sup.2d at 123-24. The District Court explained that while Sections 1771e and 1771g of the Federal Act “prescribe the limits of the Tribe’s jurisdiction over members and non-members of the tribe and over the settlement lands they do not speak to the question of the extent to which Massachusetts may exercise jurisdiction over the Tribe itself. Indeed, these provisions are altogether silent on the question of tribal sovereign immunity.” Id. at 124. The Court stated that “jurisdiction over tribal lands simply does not confer jurisdiction over the tribe itself.” Id. Finally, the Court *663 noted that Congress has no difficulty expressing in plain terms any limitations it intends upon the sovereign immunity of Native American tribes, as evidenced by the language of the Maine Indian Claims Settlement Act, passed seven years before the Federal Act, which provides that all tribes in the State of Maine shall be subject to “the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person or land therein” and “may sue and be sued in the courts of the State of Maine and the United States to the same extent as any other entity or person residing in the State of Maine may sue or be sued in these courts.” Id at 125. This Court concurs with the District Court’s sound reasoning in the Wampanoag case.
The plaintiff contends, however, that the District Court’s conclusion that Congress did not waive the Tribe’s sovereign immunity in the Federal Act should be limited to the context of that case, an employment discrimination action brought by a non-Native American against the Tribe, arguing that the language of 1771g of the Federal Act can reasonably be construed as an express waiver of sovereign immunity in the narrow class of cases involving land use issues. Section 1771g provides in relevant part that the Tribe’s land “shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts.” However, as noted by the District Court, jurisdiction over tribal lands does not automatically confer jurisdiction over the tribe itself. Wampanoag Tribe of Gay Head v. MCAD, 63 F.Sup.2d at 123-24; Maynard v. Narragansett Indian Tribe, 798 F.Sup. 94, 97 (D.R.I. 1992), aff'd., 984 F.2d 14, 16 (1st Cir. 1993) (concluding that language in Rhode Island Indian Claims Settlement Act that tribal lands would be “subject to the civil and criminal laws and jurisdiction of the State of Rhode Island” did not constitute Congressional abrogation of tribe’s sovereign immunity).[5] Moreovér, the fact that substantive law applies to the conduct of a tribe on its land does not mean that the tribe no longer enjoys immunity from suit. “There is a difference between the right to demand compliance with state laws and the means available to enforce them.” Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751, 755 (1998). See also Oklahoma Tax Comm’n v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 514 (1991) (noting that although sovereign immunity may give the State a right without an effective remedy, State may enter into agreement with tribe to adopt enforcement regime or may seek legislation from Congress). Cf. Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 356-57 (2nd Cir. 2000) (concluding that although tribe was subject to substantive provisions of the Copyright Act, Congress did not abrogate tribal immunity with respect to suits thereunder); Florida Paraplegic Ass’n v. Miccosukee Tribe of Florida, 166 F.3d 1126, 1134-35 (1st Cir. 1999) (concluding that although Title III of the ADA applies to Indian tribes, Congress did not abrogate tribal immunity with respect to enforcement of that statute). An examination of the Federal Act compels the conclusion that Congress did not expressly and unequivocally waive the Tribe’s sovereign immunity with respect to land use issues.
Thus, this Court has jurisdiction over this action only if the Tribe itself has waived its sovereign immunity or consented to suit. Foremost, this Courtis not persuaded by the plaintiffs contention that the Tribe’s invocation of the jurisdiction of the Massachusetts courts on several prior occasions, including a civil action against the Aquinnah Zoning Board in Dukes County Superior Court in 1993, constitutes consent to the jurisdiction of the court in this matter. The case law does not support the proposition that a waiver of sovereign immunity can be implied on this basis. See, e.g., Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. at 509 (tribe does not waive sovereign immunity from actions that could not otherwise be brought against it merely because those actions were pleaded in a counterclaim to an action filed by the tribe); Pit River Home and Agricultural Cooperative Assoc. v. United States, 30 F.3d 1088, 1100 (9th Cir. 1994) (fact that tribe filed claims in federal court on other occasions did not constitute waiver of its sovereign immunity with respect to unrelated suit filed against it). Similarly, the Tribe’s past compliance with the Town’s permitting procedures cannot constitute a waiver of its sovereign immunity.
The plaintiff further contends that through the terms of the Settlement Agreement, the Tribe has waived its sovereign immunity and consented to suit with respect to its use of the Cook Lands. To relinquish its sovereign immunity, a tribe’s waiver must be clear; however, an explicit waiver of tribal immunity need not use the words “sovereign immunity.” C&L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 532 U.S. at 418, 420-21. “Courts must take a practical, commonsense approach in attempting to separate words that can fairly be construed as comprising a waiver of tribal sovereign immunity from words that fall short.” Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Auth., 207 F.3d 21, 31 (1st Cir. 2000). The cases involving contractual waivers of tribal immunity have found waiver from terms expressing the tribe’s amenability to suit and an intent that certain matters be resolved either in a particular judicial forum or an arbitral forum with some mechanism for judicial enforcement. Thus, for example, where a tribe entered into a contract containing an arbitration clause that judgment upon an arbitration award could be entered in any court having jurisdiction thereof and containing a choice of law provision, these provisions were a sufficiently clear waiver of the tribe’s immunity from suit with respect to matters involving the contract. See C&L Enterprises Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 532 U.S. at 418-20. Accord Ninigret Develo *664 pment Corp. v. Narragansett Indian Wetuomuck Housing Auth., 207 F.3d at 31-32 (contract committing disputes to arbitration and providing that arbitration “shall be enforceable under prevailing law” was clear waiver of sovereign immunity for contract claims).
Further, in Rosebud Sioux Tribe v. Val-U Constr. Co. of South Dakota, Inc., 50 F.3d 560 (8th Cir.), cert. den., 516 U.S. 819 (1995), the Eighth Circuit concluded that an arbitration clause in a contract stating, “All questions of dispute under this Agreement shall be decided by arbitration in accordance with the Construction Industry Rules of the American Arbitration Association” constituted a clear waiver of tribal immunity for claims under the contract because the Rules referenced in the contract explicitly provide for judicial enforcement of any arbitration award. Id. at 563. But see Pan American Co. v. Sycuan Band of Mission Indians, 884 F.2d 416, 419 (9th Cir. 1989) (concluding that a virtually identical arbitration clause did not constitute a waiver of tribal immunity and rejecting argument that submission to arbitration is necessarily a submission to judicial jurisdiction). In contrast, clauses in a promissoiy note providing the parties with all “rights and remedies provided by law,” providing for recovery of attorneys fees incurred in collection efforts, and providing the choice of law to be applied to the parties’ rights and obligations did not constitute an express waiver of immuniiy to suit under the note because they did not manifest a specific intent to subject disputes under the note to a judicial forum or to allow for judicial enforcement. American Indian Agricultural Credit Consortium, Inc. v. Standing Rock Sioux Tribe, 780 F.2d 1374, 1376-81 (8th Cir. 1985). Cf. Nenana Fuel Co., Inc. v. Native Village of Venetie, 834 P.2d 1229, 1233 (Alaska 1992) (concluding that provisions in note allowing parties to bring an action upon the note, dispose of the collateral and bring an action against Debtor for deficiency, and invoke any right or remedy provided by law constituted express waiver of tribal immunity under note).
In the present case, the Settlement Agreement expressly states that land owned by the Tribe shall be subject to all State, Federal and local laws including the Town’s zoning laws. Similarly, the State Act provides that the laws, statutes, and bylaws of the Commonwealth and the Town shall apply to the Tribe’s land. Finally, the Federal Act provides that the Tribe’s land shall be subject to the civil and criminal laws, ordinances and jurisdiction of the Commonwealth and the Town. The plaintiff contends that these provisions constitute an agreement by the Tribe to subject its land to a zoning regime which necessarily includes the judicial review and enforcement procedures set forth in G.L.c. 40A, 17. It is clear from everything presented to this Court that the Town and the Tribe intended that the environmentally sensitive Cook Lands be subject to state and local land use requirements and that the Tribe be required to comply with the Town’s substantive zoning laws. Common sense dictates that to effect the protection of the Cook Lands, the parties surely intended to include a meaningful remedy such as judicial review and enforcement. However, the relevant case law emphasizes that there is a difference between the right to demand compliance with state laws and the means available to' enforce them, such that a tribe may be subject to substantive law while still retaining its immunity from enforcement of those laws in court. See Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. at 755; Oklahoma Tax Comm’n v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. at 514. Consent by a tribe to application of the substantive laws of the State is not the equivalent of consent to a waiver of sovereign immunity, for which there must be a clear expression of intent. Similarly, the fact that the Settlement Agreement and Federal Act restrict the Tribe’s exercise of jurisdiction over its land by requiring that it be consistent with state and local law does not constitute a waiver of the Tribe’s sovereign immunity.
In contrast to the arbitration cases cited by the plaintiff, none of the documents at issue in this case explicitly incorporate the statutory zoning scheme, nor do they reference enforcement mechanisms or a judicial forum. Cf. C&L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 532 U.S. at 418-20; Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Auth., 207 F.3d at 31-32; Rosebud Sioux Tribe v. Val-U Constr. Co. of South Dakota, Inc., 50 F.3d at 563.[6] General statements of the applicability of the zoning laws to the Cook Lands fall short of expressing the Tribe’s consent to subject itself to the jurisdiction of the courts with respect to enforcement of those laws. Cf. Maynard v. Narragansett Indian Tribe, 984 F.2d at 16 (concluding that language subjecting tribal lands to “civil and criminal laws and jurisdiction of the State of Rhode Island” did not speak to issue of tribe’s immunity from suit).
Nonetheless, paragraph 3 of the Settlement Agreement states that the Tribe shall hold its land “in the same manner, and subject to the same laws, as any other Massachusetts corporation, except to the extent specifically modified by this agreement and the accompanying proposed legislation.” The plaintiff argues that this language constitutes a waiver of the Tribe’s sovereign immunity with respect to matters relating to its land because corporations are subject to the court’s jurisdiction in cases to enforce the zoning laws. The plaintiffs rely for this proposition on South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498 (1986), a case involving the Catawba Indian Tribe Division of Assets Act, 25 U.S.C. 931-38, a statute which terminated the federal government’s supervisory responsibilities for the tribe, revoked the tribe’s constitution, and distributed its assets, including former reservation lands, to the enrolled members of the tribe. See id at 503-04. The Act provided that “all statutes of the United States that affect Indians because of their status as Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction.” Id at 505. The U.S. *665 Supreme Court concluded that pursuant to this clear language, the tribe was not immune from the application of the state statute of limitations to a lawsuit it filed against various claimants for trespass on its land. Id. at 509-10. This Court is not persuaded that under South Carolina v. Catawba Indian Tribe, Inc., the language in the Settlement Agreement that the Tribe holds its land “in the same manner, and subject to the same laws, as any other Massachusetts corporation" constitutes a waiver of its sovereign immunity. The South Carolina case involved a statute the very purpose of which was to remove from a particular tribe the special protections and benefits conferred upon recognized Native American tribes as sovereign entities. See 476 U.S. at 503-04. For purposes of waiving the Tribe’s sovereign immunity in the present case, the cited language falls short.
Paragraph 3 of the Settlement Agreement further states that “(ujnder no circumstances, including any future recognition of the existence of an Indian tribe in the Town of Gay Head, shall the civil or criminal jurisdiction of the Commonwealth of Massachusetts, or any of its political subdivisions, over the settlement lands, or any land owned by the Tribal Land Corporation in the Town of Gay Head, or the Commonwealth of Massachusetts, be impaired or otherwise altered, except to the extent modified in this agreement and in the accompanying proposed legislation .. .” While this language clearly contemplates that federal recognition of the Tribe would impact its relationship vis avis the Town, this Court concludes that as an expression of waiver of sovereign immunity from suit, the reference to future tribal recognition in connection with state jurisdiction over the land falls short.
This Court acknowledges that in negotiating the Settlement Agreement the Town intended to bargain not merely for a hollow right to apply substantive zoning law to the environmentally sensitive Cook Lands but also for the practical power to enforce that law against the Tribe in a judicial forum. However, absent clear consent by the Tribe to such judicial intervention, this Court is constrained to conclude that the Town received a right but no remedy, to the detriment of the citizens of not only the Town but the Commonwealth. In the view of this Court, said result is patently unfair. “If injustice has been worked in this case, it is not the rigid express waiver standard that bears the blame, but the doctrine of sovereign immunity itself. But it is too late in the day, and certainly beyond the competence of this court, to take issue with a doctrine so well established.” American Indian Agricultural Credit Consortium, Inc. v. Standing Rock Sioux Tribe, 780 F.2d at 1379. Accordingly, the Tribe is entitled to judgment as a matter of law on the complaint and on Count I of its counterclaim.[7]
ORDER
For the foregoing reasons, it is hereby ORDERED that the plaintiffs motion for summary judgment be DENIED and that the defendants’ cross motion for summary judgment on the complaint be ALLOWED. It is further ORDERED that the complaint be DISMISSED. It is hereby ORDERED that the defendants’ motion for summary judgment on Count I of their counterclaim be ALLOWED.
Judgment shall enter DECLARING that the Tribe retains its sovereign immunity from civil suit to enforce the Town’s zoning ordinance and the March 30, 2001 Cease and Desist Order issued by the Building Inspector.

Section 7.20 of the current Aquinnah Zoning By-law defines the Coastal District as “The land, streams and wetlands which lie below the ten (10) foot elevation above mean sea level, or within five hundred (500) feet at the inland edge of any breach or marsh grasses behind mean high water of . . . Menemsha Pond . . .” Pursuant to 7.40.02 of the current By-law, a special permit from the Planning Board Plan Review Committee is required for the construction of any structure within 100 feet of Menemsha Pond, and the only structures allowed by special permit are fishing related commercial marine structures.

The counterclaim further seeks a declaration that the Tribe’s federal rights of self-government prevent the exercise of jurisdiction over the Tribe by the Town Building Inspector and Zoning Officer, and that the Town has violated 42 U.S.C. 1983.

Cf. Cotton Petroleum Corp. v. New Mexico, 490 U.S. at 176 (stating that questions of federal preemption of state taxation of lessees on Indian land are not controlled by “mechanical or absolute conceptions of state or tribal sovereignty” and each case “requires a particularized examination of the relevant state, federal, and tribal interests”).

This Court is not persuaded by the plaintiffs argument that the distinction between jurisdiction over land and jurisdiction over the Tribe via a waiver of tribal immunity has been over ruled by the First Circuit in State of Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685 (1st Cir.), cert. den., 513 U.S. 919 (1994), a case which did not explicitly deal with tribal sovereign immunity but rather, concerned whether the provision of the Rhode Island Settlement Act that tribal lands were “subject to the civil and criminal laws and jurisdiction of the State of the Rhode Island” included regulatory jurisdiction over gaming and remained valid for purposes of the Indian Gaming Regulatory Act, 25 U.S.C. 2701-21, 18 U.S.C. 1166-68. See id. at 694-97. As this Court reads the case, the First Circuit in State of Rhode Island simply rejected the District Court’s conclusion in Maynard that the state’s regulatory laws were not included in the Settlement Act’s conferral of “civil laws and jurisdiction” over tribal land. See 19 F.3d at n.10.

This Court further notes that section 4 of the State Act contains an explicit reference to judicial enforcement in a different context by providing in relevant part that, “The Tribal council. . . will have the right... to establish its own regulations concerning hunting [which] shall impose reasonable standards of safety for persons and protection of wild life . . . These safety and protections standards shall be subject to review for reasonableness in an action in superior court and may be enforced by state and local law enforcement officers.” St. 1985, c. 277, 4(b).

In its brief, the Tribe states that an award of summary judgment in its favor on the issue of sovereign immunity is dispositive such that this Court need not address the additional declaratory relief sought in Count II of its counterclaim. Accordingly, this Court declines to rule on Count II. It is not clear whether the Tribe intends to pursue that portion of Count II which asserts a 1983 claim. But see Inyo County v. *666 Paiute-Shoshone Indians of the Bishop Community, 123 S.Ct. 1887 (May 19, 2003) (concluding that tribe is not a “person” who may sue under 42 U.S.C. 1983 for violation of tribe’s right to self-government).