LYNCH, Circuit Judge.
The Penobscot Nation (the “Nation”) filed suit in federal court against the State of Maine and various state officials (the “State Defendants”), claiming rights as to a 60-mile stretch of the Penobscot River, commonly known as the “Main Stem.” The United States intervened in support of the Nation. Private interests, towns, and other political entities, whom we shall call the “State Intervenors,” intervened in support of the State Defendants’ position.
The district court, on cross-motions for summary judgment, made two rulings: (1) “[T]he Penobscot Indian Reservation as defined in [the Maine Implementing Act (“MIA”), Me. Rev. Stat. Ann. tit. 30 (“30 M.R.S.A.”),] § 6203(8) and [the Maine Indian Claims Settlement Act (“MICSA”) ], 25 U.S.C. § 1722(i), includes the islands of the Main Stem, but not the waters of the Main Stem,”. Penobscot Nation v. Mills, 151 F.Supp.3d 181, 222 (D. Me. 2015); and (2) “[T]he sustenance fishing rights provided in ... 30 M.R.S.A. § 6207(4) allows the Penobscot Nation to take fish for individual sustenance in the entirety of the Main Stem section of the Penobscot River,” id. at 222-23. The court issued declaratory relief to that effect on both points. Id.
In these cross-appeals, we affirm the first ruling and hold that the plain text of the definition of “Penobscot Indian Reservation” in the MIA and the MICSA (together, the “Settlement Acts”), includes the specified islands in the Main Stem, but not the Main Stem itself. As to the second ruling on sustenance fishing, we vacate and order dismissal. That claim is not ripe, and under these circumstances, the Nation lacks standing to pursue it.
Those interested in further details of this dispute will find them in the district court opinion. See Penobscot Nation, 151 F.Supp.3d at 185-212. Given that the plain text of the statutes resolves the first issue and that there is no Article III jurisdiction as to the second, we do not and may not consider that history. Instead, we get directly to the point on both issues.
I.
This litigation began shortly after the Maine Warden Service and the Maine De *328 partment of Inland Fisheries and Wildlife requested a legal opinion from Maine’s then-Attorney General William Schneider “regarding the respective regulatory jurisdictions of the ... Nation and the State of Maine ... relating to hunting and fishing on the [MJain [S]tem of the Penobscot River.” Attorney General Schneider issued his opinion (the “Schneider Opinion” or “Opinion”) on August 8, 2012. On the same day, Attorney General Schneider sent a copy of the Opinion to the Governor of the Nation and noted in a cover letter: “I also understand that there have been several incidents in recent years in which ... Nation representatives have confronted state employees, including game wardens, as well as members of [the] public, on the River for the purpose of asserting jurisdiction over activities occurring on the River.”
The Schneider Opinion states that “the ... Nation may lawfully regulate hunting on, and restrict access to, the islands within the River from Medway to Old Town that comprise its Reservation, but may not regulate activities occurring on, nor restrict public access to, the River itself’ and that “the State of Maine has exclusive regulatory jurisdiction over activities taking place on the River.”
The Nation filed suit in federal court against the State Defendants on August 20, 2012. In its second amended complaint, the Nation sought a declaratory judgment that the Schneider Opinion misinterprets federal law — namely,, MISCA — and that both the Nation’s regulatory authority and its sustenance fishing rights extend to and include the Main Stem of the Penobscot River. The State Defendants answered the Nation’s complaint and filed counterclaims. The State Defendants sought a declaratory judgment that, among other things, “[t]he waters and bed of the [M]ain [S]tem of the Penobscot River are not within the Penob-scot Nation reservation.” All parties agree that the State Defendants’ declaratory judgment claim on this point is ripe.
The United States, through the Department of Justice, filed a motion to intervene on behalf of the Nation on August 16, 2013, and the district court granted the United States intervenor status on February 4, 2014.[1] The State Intervenors filed their motion to intervene in support of the State Defendants on February 18, 2013, which the district court granted on June 18, 2013. The parties engaged in discovery and further procedural sparring, after which the Nation, the State Defendants, and the United States each moved for summary judgment, and the State Intervenors moved for judgment on the pleadings.
The positions of the Nation and the United States differed slightly. The Nation defined the term “Reservation” to include the entire Main Stem, bank-to-bank,' and its submerged lands. The United States said that that was its preferred reading, but it offered as another possible reading that the “Reservation” reaches the “thread” or centerline of the River. This alternative reading would create “halos” around each of the Nation’s islands, in which the Nation could engage in sustenance fishing.
*329 After oral argument, the district court issued its opinion.[2] The Nation and the United States then filed motions to amend the judgment, seeking to “clarify” that the Penobscot Indian Reservation includes submerged lands on each side of the Nation’s islands to the thread of the Penob-scot River, or alternatively “clarify” that the court had not decided the issue. The State Defendants opposed the motions, and the court summarily denied the motions.
These cross-appeals followed.
II.
We review orders granting summary judgment de novo. McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014). The parties agreed before the district court that the record was “amenable to resolution” by summary judgment, and the court agreed, concluding that it could “disregard as immaterial many factual disputes appearing in the record.” Penobscot Nation, 151 F.Supp.3d at 185 & n.4. All of the issues here are ones of law, which we review de novo. Franceschi v. U.S. Dep’t of Veterans Affairs, 514 F.3d 81, 84-85 (1st Cir. 2008).
A. Construction of 30 M.R.S.A. § 6203(8)
Section 6203(8) of the MIA, which sets out what “Penobscot Indian Reservation” “means” under the MIA, in turn controls what “Penobscot Indian Reservation” “means” for federal law purposes, 25 U.S.C. § 1722® (“ ‘Penobscot Indian Reservation’ means those lands as defined in the [the MIA].”). “As a rule, [a] definition which declares what a term ‘means’ ... excludes any meaning that is not stated.” Burgess v. United States, 553 U.S. 124, 130, 128 S.Ct. 1572, 170 L.Ed.2d 478 (2008) (alterations in original) (quoting Colautti v. Franklin, 439 U.S. 379, 392-93 n.10, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979)).
The interpretation of section 6203(8) presents a question of statutory construction. We apply traditional rules of statutory construction to the Settlement Acts. See Maine v. Johnson, 498 F.3d 37, 41-47 (1st Cir. 2007); Aroostook Band of Micmacs v. Ryan, 484 F.3d 41, 50, 56 (1st Cir. 2007). The canon construing statutory ambiguities in favor of Indian tribes does not apply when the statutory language is unambiguous. South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986); see also, e.g., Carcieri v. Salazar, 555 U.S. 379, 387, 129 S.Ct. 1058, 172 L.Ed.2d 791 (2009) (holding that where the language of the Indian Reorganization Act is unambiguous, the court must enforce its plain meaning).[3]
*330 “As in any statutory construction case, ‘[w]e start, of course, with the statutory text. Sebelius v. Cloer, 569 U.S. 369, 133 S.Ct. 1886, 1893, 185 L.Ed.2d 1003 (2013) (alteration in original) (quoting BP Am. Prod. Co. v. Burton, 549 U.S. 84, 91, 127 S.Ct. 638, 166 L.Ed.2d 494 (2006)). The MIA states that
“Penobscot Indian Reservation” means the islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine consisting solely of Indian Island, also known as Old Town Island, and all islands in that river northward thereof that existed on June 29, 1818, excepting any island transferred to a person or entity other than a member of the Penobscot Nation subsequent to June 29, 1818, and prior to the effective date of this Act.
30 M.R.S.A. § 6203(8). Where the meaning of the statutory text is plain and works no absurd result, the plain meaning controls. See Lamie v. U.S. Trustee, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (“It is well established that ‘when the statute’s language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms.’” (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000))). Such is the case here.[4]
The analysis turns on what “the islands in the Penobscot River” means. “Island” is not given a special definition in the MIA, and so we “construe [it] in accordance with its ordinary or natural meaning.” FDIC v. Meyer, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994).[5] In its ordinary use, “island” refers to a piece of land that is completely surrounded by water. See, e.g., Island, Oxford English Dictionary Online, http://www.oed.com/ view/Entry/99986 (last visited June 20, 2017) (first definition) (“A piece of land completely surrounded by water.”); Island, Merriam-Webster’s Dictionary Online, https://www.merriam-webster.com/ dictionary/island (last visited June 20, 2017) (first definition) (“[A] tract of land surrounded by water and smaller than a continent[.]”); Island, Dictionary.com, http://www.dictionary.com/browse/island (last visited June 20, 2017) (first definition) (“[A] tract of land completely surrounded by water, and not large enough to be called a continent.”).[6] Its ordinary meaning *331 is clear and unambiguous. See also Carden, 555 U.S. at 388-90, 129 S.Ct. 1058 (interpreting the use of “now” in 25 U.S.C. § 479 through its ordinary meaning and use in the statute, and finding the term unambiguous).
To add emphasis to the limits of this definitional term, the statute further states that the Reservation “islands” “eonsist[] solely” of the enumerated islands. 30 M.R.S.A. § 6203(8) (emphasis added). “ ‘Solely" leaves no leeway.” Helvering v. Sw. Consol. Corp., 315 U.S. 194, 198, 62 S.Ct. 546, 86 L.Ed. 789 (1942).
Our holding that the term “island” does not refer to the surrounding water itself or to the land submerged by the surrounding water is also compelled by other text within the Settlement Acts. See, e.g., Henson v. Santander Consumer USA Inc., — U.S. -, 137 S.Ct. 1718, 1722-23, 198 L.Ed.2d 177 (2017) (confirming plain meaning reading by “[¡looking to other neighboring provisions in the [statute]”). When the Settlement Acts mean to address the various topics of water, water rights, or submerged land, they do so explicitly and use different language. See, e.g., 25 U.S.C. § 1721(b)(2) (“It is the purpose of this subchapter ... to clarify the status of ... natural resources in the State of Maine.”); id. § 1722(b) (defining the phrase “land or natural resources” in the MICSA as “any real property or natural resources ... including ... water and water rights”); 30 M.R.S.A. § 6203(3) (defining the phrase “land or other natural resources” in the MIA as “any real property or other natural resources ... including ... water and'water rights”); 25 U.S.C. § 1722(n) and 30 M.R.S.A. § 6203(13) (including “natural resources” as things that can be “transferred” as that word is used in the Settlement Acts); 30 M.R.S.A. § 6207 (discussing regulation of “waters”); id. § 6207(1)(B) (addressing regulation of “[t]aking of fish on any pond in which all the shoreline and all submerged lands are wholly within Indian territory,” and using the term “territory” *332 rather than “Reservation” (emphasis added)).
Further, section 6205(3)(A), which deals with purchases of land to compensate for regulatory takings within Indian reservations, states that “[f]or purposes of this section, land along and adjacent to the Penobscot River shall be deemed to be contiguous to the Penobscot Indian Reservation,” thus implying that otherwise the “Reservation” is not contiguous to land along and adjacent to the Penobscot River. 30 M.R.S.A. § 6205(3)(A). The Nation’s and United States’ construction of “Penob-scot Indian Reservation” would render that language superfluous, a result forbidden by the canons of construction. See In re Montreal, Me. & Atl. Ry., Ltd., 799 F.3d 1, 9 (1st Cir. 2015) (“[Cjourts should construe statutes to avoid rendering superfluous any words or phrases therein'.”).
The MICSA’s definitional provision for “Penobscot Indian Reservation” itself reinforces this plain-meaning reading of the MIA. Section 1722(i) of the MICSA provides that “ ‘Penobscot Indian Reservation’ means those lands as defined in [the MIA].” 25 U.S.C. 1722® (emphasis added). In its ordinary meaning, the unadorned term “land” does not mean water. It means land, as distinct from water.[7] The MICSA does not say waters are included within the boundaries of the “Penobscot Indian Reservation.” Taken together, the Settlement Acts unambiguously define “Penobscot Indian Reservation” as specified islands in the Main Stem of the Pe-nobscot River, and not the Main Stem itself or any portion of the Main Stem. The plain meaning of “islands in the Penobscot River” is the islands in the River, not the islands and the River or the riverbed.
The Nation and the United States agree that a plain-meaning reading must control. They offer a different reading of what that plain meaning is. They argue that the definition of “Penobscot Indian Reservation” in section 6203(8) is modified.by section 6207(4)’s grant of sustenance fishing rights to the Nation “within the boundaries of [the Nation’s] Indian reservation ].” 30 M.R.S.A. § 6207(4).[8] They contend that because section 6207(4) was meant to protect the Nation’s sustenance fishing rights in the Penobscot River, a reading of section 6203(8) based on the otherwise plain meaning of the term “islands” must be rejected because it would lead to the absurd result of nullifying section 6207(4).
Not so. The two provisions — sections 6203(8) and 6207(4) — are not in tension. The Nation’s and United States’ argument *333 selectively omits relevant text and also ignores the differences in text between the two sections. Section 6203 itself specifically articulates that definitions in its subsections do not apply when “the context indicates otherwise,” 30 M.R.S.A. § 6203, which governs section 6207(4). This clause avoids any supposed conflict between section 6203(8) and section 6207(4) through the statute’s own provisions. There is no need to distort the plain meaning of “islands” in section 6203(8).
Also, the sustenance fishing provision refers to “Indian reservations,” not just the “Penobscot Indian Reservation,” as it applies “within the boundaries” of both the Passamaquoddy Tribe’s and the Nation’s respective reservations. Id. § 6207(4). If the term “island” in section 6203(8) was meant to include all or any portion of the surrounding waters, the text would have said so. As Justice Scalia observed in a Chevron case, see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), legislatures do not “hide elephants in mou-seholes.” Whitman v. Am. Trucking Ass’ns, Inc., 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). The ancillary reference to “Indian reservations” referring to both the Passamaquoddy Tribe and the Nation in section 6207(4) cannot dramatically alter the plain meaning of section 6203(8)’s definition of “Penobscot Indian Reservation.”
The Nation and the United States also point to the reference to previous “agreement[s]” in section 6203(8): “the islands in the Penobscot River reserved to the Pe-nobscot Nation by agreement with the States of Massachusetts and Maine consisting solely of Indian Island ... and all islands in that river northward thereof that existed on June 29, 1818, excepting any island transferred [after] June 29, 1818.” 30 M.R.S.A. § 6203(8). They argue that the reference to the previous treaties found in the “by agreement” clause means that the definition of “Penobscot Indian Reservation” incorporates the Nation’s understanding of the treaties and state common law. Again, not so. The reference to the treaties is merely language specifying which “islands” are involved, not language modifying the meaning of “islands.” The treaties no longer have meaning independent of the Maine Settlement Acts. Rather, upon the passage of the Acts, the treaties were subsumed within the Acts, and we look only to the statutory text to understand the reservation’s boundaries.
The Nation and the United States further argue that, regardless of text, the district court’s reading of section 6203(8) must be incorrect because it contradicts the Supreme Court’s holding in Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918). It does not. Alaska Pacific concerned the interpretation of a distinct phrase, “the body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska,” in an unrelated congressional statute that was enacted in 1891 before Alaska became a state. Id. at 86, 39 S.Ct. 40 (quoting Act of March 3, 1891, ch. 561, § 15, 26 Stat. 1095, 1101). The Court considered not only the statute’s plain text but also the legislative history of the statute and the “general rule that statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expression resolved in favor of the Indians.” Id. at 78, 39 S.Ct. 40. In light of those considerations, the Court held that Congress “did not reserve merely the site of [the Metlakahtlans’] village, or the island on which they were dwelling, but the whole of what is known as Annette Islands, and referred to it as a single body of lands.” Id. at 89, 39 S.Ct. 40.
Alaska Pacific’s holding does not affect the question before us. Despite the super *334 ficial similarities between the definition of the Penobscot reservation and the statute at issue in Alaska Pacific, they differ materially. The Alaska Pacific Court found it “important,” if not “essential,” to consider “the circumstances in which the reservation was created.” Id. at 87, 39 S.Ct. 40. Not so here: the definition of the Penob-scot reservation lacks any comparable ambiguity, and any resort to “the circumstances in which the reservation was created” would be neither important nor essential but, rather, wholly unnecessary. The definition of the Penobscot Indian Reservation specifies that it consists “solely of Indian Island ... and all islands in that river.” 30 M.R.S.A. § 6203(8) (emphasis added). The definition in Alaska Pacific has no limiting term comparable to the adverb “solely.” Moreover, the definition of the Penobscot reservation refers only to “islands in the Penobscot River” and “islands in that river.” Id. (emphases added). As discussed above, this forms a clear distinction between uplands and the river itself. In contrast, the definition in Alaska Pacific uses a much vaguer phrase: “the body of lands known as Annette Islands, situated in Alexander Archipelago.” 248 U.S. at 86, 39 S.Ct. 40. Unlike the Alaska Pacific Court, we have no need to consider legislative history or the Indian canons of construction, see supra note 3, because the plain text of the definition of the Penobscot reservation is unambiguous.[9]
We are forbidden by law from varying from the plain text based on arguments made as to the nature of the Agreement reached. We do not look to either side’s understanding of the Agreement when the meaning of the text of the Settlement Acts is plain.[10] See Star Athletica, L.L.C. v. Varsity Brands, Inc., — U.S. -, 137 S.Ct. 1002, 1010, 197 L.Ed.2d 354 (2017) (“The controlling principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written.” (quoting Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992))); Puerto Rico v. Franklin Cal. Tax-Free Tr., — U.S. -, 136 S.Ct. 1938, 1946, 195 L.Ed.2d 298 (2016) (question of statutory interpretation “begins “with the language of the statute itself,’ and that ‘is also where the inquiry should end,’ for ‘the statute’s language is plain’ ” (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989))).
The Nation’s and United States’ arguments from history and each party’s intent would be relevant only if the statutory language were ambiguous. See Matal v. Tam, -U.S. -, 137 S.Ct. 1744, 1756-57, 198 L.Ed.2d 366 (2017) (“These argu *335 ments are unpersuasive. As always, our inquiry into the meaning of the statute’s text ceases when ‘the statutory language is unambiguous and the statutory scheme is coherent and consistent.’ ” (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002))); Milner v. Dep’t of the Navy, 562 U.S. 562, 572, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011) (“Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language.”). The language is not ambiguous.
The district court was correct to hold that the Settlement Acts mean what they plainly say. The Penobscot Indian Reservation consists of the specified “islands in” the Main Stem of the Penobscot River. It does not include the Main Stem itself, any portion thereof, or the submerged lands underneath.
As to the dissent’s three reasons to reach the opposite conclusion, as explained, the Alaska Pacific opinion does not provide the rule for decision because it concerned an entirely different provision in a different statute. The dissent departs from the Supreme Court’s mandate that courts must interpret statutes according to their plain text. See Tam, 137 S.Ct. at 1756 (noting that a party’s “argument is refuted by the plain terms of the [statute]”); Henson, 137 S.Ct. at 1725 (“And while it is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about [congressional intent].”); Star Athletica, LLC, 137 S.Ct. at 1010 (“We ... begin and end our inquiry with the text....”); Samsung Elecs. Co. v. Apple Inc., — U.S. -, 137 S.Ct. 429, 434, 196 L.Ed.2d 363 (2016) (“The text resolves this case.”). Second, the statute is clear that the role of the treaties is simply to define which “islands” are included in the Reservation, not to alter the plain meaning of the term Reservation itself.
Third, the question of the definition of Reservation is not the same as the unripe question of sustenance fishing. The MIA itself provides for how to resolve tensions between the definition of Reservation and the use of that term in the sustenance fishing provision.
Maine v. Johnson, 498 F.3d 37 (1st Cir. 2007), cited heavily by the dissent, concerned an entirely different issue and did not present the issue of the meaning of Penobscot Indian Reservation in the Settlement Acts. Footnote 11 of Johnson, which the dissent suggests controls this case, merely distinguishes between Reservation lands and land later acquired in trust. Id at 47 n.ll. It is simply not true that this court has held in Johnson that the definition of Reservation embraced the waters of the Penobscot River. Johnson addressed a distinct question and, in doing so, explicitly bypassed any territorial dispute that might have been implicated by that question. See id at 40 n.3 (“The territorial boundaries are disputed but, for purposes of this case, we assume (without deciding) that each of the disputed ... points lies within the tribes’ territories.”); see also id. at 47. It has no bearing on the precise boundaries of the Nation’s Reservation as that term is used in the Settlement Acts.
Moreover, while the Nation and the United States referred glancingly in their briefing to footnote 11 in Johnson, they did not argue that the issue presented in this case was already decided by Johnson. The *336 dissent has made this argument for them.[11] The dissent’s version of history does not illuminate the plain meaning of the text and is impermissible to consider.[12]
We affirm the entry of declaratory judgment for the defendants on this point.
B. Sustenance Fishing Rights
We hold that the federal courts lack jurisdiction in the circumstances" of this case to adjudicate the question of the Nation’s sustenance fishing rights. The district court erred in reaching this issue because the issue is not ripe and the plaintiffs presently lack standing. As a result, we vacate the district court’s ruling on this issue, without adjudicating the merits of the sustenance fishing issue, and order dismissal of this claim for relief.
The Constitution limits the jurisdiction of the federal courts to “Cases” and “Controversies.” U.S. Const, art. Ill, § 2. Two “interrelated” “manifestations” of that limitation “are the justiciability doctrines of standing and ripeness.” Reddy v. Foster, 845 F.3d 493, 499, 505 (1st Cir. 2017) (affirming dismissal of challenge to never-implemented statute). The plaintiffs cannot satisfy either doctrine as to the sustenance fishing issue.
The standing doctrine requires, inter alia, that a plaintiff show an “injury in fact,” which is “ ‘an invasion of a legally protected interest’ that is ‘concrete and particularized’ and ‘actual or imminent, not conjectural or hypothetical.’ ” Spokeo, Inc. v. Robins, — U.S. -, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).
The Nation alleges that the Schneider Opinion poses a “threat” to its sustenance fishing rights. We see no such threat. Allegations of future injury confer standing only “under circumstances that render the threatened enforcement sufficiently imminent.” Susan B. Anthony List v. Driehaus, — U.S. -, 134 S.Ct. 2334, 2342, 189 L.Ed.2d 246 (2014). That test is not met.
The Schneider Opinion does not confer standing on the Nation now to obtain relief as to the sustenance fishing issue. The Opinion itself does not address or even mention the scope of the Nation’s fishing rights. Nothing about the Opinion evidences that Maine threatens an injury— imminent or otherwise — to the Nation’s sustenance fishing activities. See Blum v. Holder, 744 F.3d 790, 792 (1st Cir. 2014) (holding that animal rights activists lacked standing to challenge the Animal Enterprise Terrorism Act where they had not *337 been prosecuted or threatened with prosecution under the statute).
On the contrary, Maine has affirmatively represented that it has a “longstanding, informal policy” not to “interferef] with [Nation] members engaged in sustenance fishing on the Maine Stem.” In Reddy, where we held there was neither standing nor ripeness, we found that the challenged unimplemented legislation did not presently interfere with the plaintiffs’ relevant activities and that the government had “affirmatively disavowed prosecution ... unless and until” certain absent preconditions were met. 845 F.3d at 502; see also Blum, 744 F.3d at 798 (“Particular weight must be given to the Government disavowal of any intention to prosecute.... ”). The Nation’s claims that the Schneider Opinion presently threatens the Tribe’s “exclusive sovereign authority to govern [sustenance fishing]” or “tribal self-government” have no support in the record.
Nor can the Nation generate standing or ripeness by its own actions. The Nation points to an Internet “alert” from a Nation official to Nation members stating that they are “at risk of prosecution by Maine law enforcement officers” if they practice sustenance fishing in the Main Stem. The State of Maine has said no such thing.
These kinds of general and hypothetical allegations of injury cannot succeed at the summary judgment stage, where the plaintiffs must do more than merely allege legal injury and must instead provide a factual basis for the alleged injury. See Lujan, 504 U.S. at 561, 112 S.Ct. 2130. The Nation and the United States have not even attempted to show that any member of the Nation has suffered any injury related to sustenance fishing practices in response to the Schneider Opinion. See Reddy, 845 F.3d at 503 (rejecting “conjectural fear” as sufficient for standing); see also Wittman v. Personhuballah, — U.S. -, 136 S.Ct. 1732, 1737, 195 L.Ed.2d 37 (2016) (“When challenged by a court (or by an opposing party) concerned about standing, the party invoking the court’s jurisdiction cannot simply allege a nonobvious harm, without more.”).
The Nation and the United States also attempt to create standing by arguing that the State Defendants’ own counterclaims in this lawsuit “necessarily place in controversy the location of the Penobscot Nation’s sustenance fishery.” The counterclaims do not do so. The State Defendants’ counterclaims referenced allegations from Maine officials and recreational users of the Main Stem that the Nation had attempted to assert exclusive control over the Main Stem by, inter alia, demanding payment for access permits. While this may establish standing as to the issue about the meaning of “Penobscot Indian Reservation” (for which standing has not been contested), it does not go to the issue of sustenance fishing rights. The allegations do not show there has been any injury to the Nation’s sustenance fishing activities. The plaintiffs cannot bootstrap the justiciability of their own claims by use of the State Defendants’ counterclaims. Cf. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (“[A] plaintiff must demonstrate standing for each claim he seeks to press.”).
The sustenance fishing claim is also not ripe. Plaintiffs must show both “fitness” and “hardship” to satisfy the ripeness analysis. Reddy, 845 F.3d at 501. The fitness prong asks “whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all,” Town of Barnstable v. O’Connor, 786 F.3d 130, 143 (1st Cir. 2015) (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 536 (1st Cir. 1995)), and the hardship prong “con *338 cerns the harm to the parties seeking relief that would come to those parties from our ‘withholding of a decision’ at this time,” Reddy, 845 F.3d at 501 (quoting Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 330 (1st Cir. 2016)).
Both prongs of the ripeness analysis prevent justiciability here. The sustenance fishing claim on this record is merely speculative. There is no evidence in this record that Maine has interfered with or threatened to interfere with the Nation’s sustenance fishing in the Main Stem, and there is not even an allegation that the State plans to change its informal policy of not interfering with sustenance fishing. We have no concrete dispute before us and so have no facts to frame the appropriate inquiry, or even any relief. See Reddy, 845 F.3d at 497.
As to hardship, “there is no apparent prejudice to the plaintiffs if they must wait until their claims ripen to sue,” because “[t]hey are ‘not required to engage in, or to refrain from, any conduct, unless and until’ ” Maine .actually takes some step to interfere with or at least officially proposes to interfere with sustenance fishing in the Main Stem. Id at 505 (quoting Texas v. United States, 523 U.S. 296, 301, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998)). The claim is not ripe for adjudication and the district court lacked jurisdiction to review it.[13]
III.
The judgment of the district court is affirmed as to the declaratory judgment regarding the definition of “Penobscot Indian Reservation” under 30 M.R.S.A. § 6203(8) and 25 U.S.C. § 1722(i), and va; cated with instructions to dismiss for want of jurisdiction as to the declaratory judgment regarding the sustenance fishing rights under 30 M.R.S.A. § 6207(4). No costs are awarded.

. The State Defendants objected to the United States’ motion to intervene on the ground that it was barred by 25 U.S.C. § 1723(a)(2), and they continue that objection on appeal.
The State Defendants filed an amended answer and counterclaims against the United States on November 3, 2014, asserting affirmative defenses that, among other things, the United States’ complaint should be dismissed for failure to join indispensable parties and as barred by 25 U.S.C. § 1723(a)(2), and seeking declaratory relief along the lines of what they requested in their counterclaims against the Nation. Given our disposition, we do not reach these questions.

. On the same day that it issued its opinion, the court, in a separate order, granted in part and denied in part the State Intervenors’ motion for judgment on the pleadings for the same reasons and also granted in part and denied in part the State Intervenors' motion to exclude expert testimony submitted by the plaintiffs. The expert testimony ruling is not at issue in this appeal.

. We reject the plaintiffs' and dissent's argument that we must apply the Indian canon of construction resolving ambiguities in favor of Indian tribes. In fact, it would be an error of law to apply the canon here, under Catawba Indian Tribe, 476 U.S. at 506, 106 S.Ct. 2039 ("The canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress.”). Because the plain meaning of the Settlement Acts resolves the question of the scope of the Reservation, there are no ambiguities to resolve in favor of the Nation. Carcieri, 555 U.S. at 387, 129 S.Ct. 1058.
The reference to the canon in Penobscot Nation v. Fellencer, 164 F.3d 706, 709 (1st Cir. 1999), noted by the dissent, does not apply here. That case concerned whether a decision by the Nation’s Tribal Council to terminate a community health nurse's em *330 ployment was an "internal tribal matter” within the meaning of the Settlement Acts. Id. at 707. Whatever ambiguities may have been presented by that question, there are none here, and so the canon cannot apply.

. We do not reach the defendants’ argument that the terms of the MICSA itself, in 25 U.S.C. §§ 1725(h) and 1735(b), bar the application of the Indian canons of construction to the MIA. And we do not reach the defendants' argument that any ambiguities in the Settlement Acts should be construed with a presumption against finding that a state has conveyed its navigable, waters.

. Because we find that the plain meaning of section 6203(8) resolves the issue of the meaning of the "Reservation,” we do not reach several of the defendants’ alternative arguments that the Main Stem has been “transferred]” from the Nation to Maine under the Settlement Acts, see 25 U.S.C. §§ 1722(b), (n), 1723; 30 M.R.S.A. §§ 6203(13), 6213, and that the doctrines of laches, acquiescence, and impossibility bar the Nation's claims.

.The dissent argues that if “island” is to be understood in terms of "land,” then we should look to dictionary definitions of "land” that the dissent claims include water. What the dissent does not reveal is that the primary definitions of "land” in all the sources it cites exclude water. The only definitions arguably helpful to the dissent are subordinate to these primary definitions. See Land, Webster’s 1913 Dictionary, http://www.webster-dictionary.org/definition/land (last visited *331 June 19, 2017) (listing as first definition ”[t]he solid part of the surface of the earth; — opposed to water as constituting a part of such surface, especially to oceans and seas; as, to sight land after a long voyage,” and listing the definition offered by the dissent eighth); Wor-dreference.com, Land, http://www. wordreference.com/definition/land (last visited June 19, 2017) (listing as first definition “any part of the earth's surface, as a continent or an island, not covered by a body of water,” and listing the definitions arguably most helpful to the dissent — "an area of ground with specific boundaries” and "any part of the earth’s surface that can be owned as property, and everything connected to it”— third and fifth, respectively); Dictionary.com, Land, http ://www. dictionary.com/browse/land (last visited June 19, 2017) (listing as first definition "any part of the earth’s surface not covered by a body of water; the part of the earth's surface occupied by continents and islands,” and listing the definition arguably most helpful to the dissent — "any part of the earth’s surface that can be owned as property, and everything annexed to it, whether by nature or by the human hand” — fifth).
We do not, as the dissent suggests, contend that a subordinate definition can never supply the operative meaning of a term. But as a general rule, a term’s “most common[,] ... ordinary and natural” meaning controls, Mallard v. U.S. Dist. Court for S. Dist. of Iowa, 490 U.S. 296, 301, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989), and “[a]ny definition of a word that is absent from many dictionaries” or consistently subordinate where included is “hardly a common or ordinary meaning," Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 132 S.Ct. 1997, 2003, 182 L.Ed.2d 903 (2012). It is clear what the.ordinary meaning of “land” is from the fact that all of the dictionaries cited above define it primarily as excluding water, while none ranks a definition inclusive of water higher than third. See id. “Were the meaning of [land’] that [the dissent] advocates truly common or ordinary, we would expect to see more support for that meaning.” Id.

. See, e.g., Land, Oxford English Dictionary Online, http://www.oed.com/view/Entry/ 105432 (last visited June 20, 2017) (first definition) ("The solid portion of the earth’s surface, as opposed to sea, water.”); Land, Merriam-Webster’s Dictionary Online, https:// www.merriam-webster.com/dictionary/land (last visited June 20, 2017) (first definition) ("[T]he solid part of the surface of the earth[.]”); Land; Dictionary.com, http://www. dictionary.com/browse/land (last visited June 20, 2017) (first definition) ("[A]ny part of the earth's surface not covered by a body of water; the part of the earth’s surface occupied by continents and islands.”).
As we have shown at note 6, supra, the dissent's attempt to argue that "land” includes water by reference to subordinate definitions of "land” from dictionaries that primarily define "land” as excluding water is unconvincing. The ordinary meaning of land, as even the sources cited by the dissent make clear, obviously excludes water.

. The Nation also makes similar contentions based on section 6207’s provisions for sustenance hunting and trapping and "related authorities.” These arguments are even less persuasive than those based on section 6207(4), as the provisions of section 6207 at issue reference the Nation's "territor[y],” a distinct term encompassing both the Reservation and over 130,000 acres of trust lands acquired by the United States on behalf of the Nation. See 30 M.R.S.A. §§ 6205(2), 6207(1).

. Hynes v. Grimes Packing Co., 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949), and Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), cited by the dissent as applying Alaska Pacific, are inapposite for the same reasons. Those cases also interpreted materially distinct language in enactments unrelated to the Settlement Acts.

. We reject the position of the United States that we should not use normal canons of statutory construction and should instead use Maine’s state law rules for the construction of deeds. We are not construing a deed.
We also reject the United States’ arguments more generally that state common law informs the definition of Reservation. Nothing in' the text of the Settlement Acts permits the use of state common law to construe the statutes’ definitional provisions. The meaning of Reservation in the Settlement Acts is plain, and we cannot use state common law to alter that plain meaning.
Finally, we reject the United States’ argument that the Settlement Acts grant to the Nation “halos” of riparian rights around each island. Nothing in the plain language of the statutes supports this position.

. The dissent, but not the United States or the Nation, argues that Maine — in its briefing in Johnson — has been inconsistent as to whether the term “islands” includes waters. Maine has had no notice of this argument or an opportunity to respond. Further, we see no necessary contradiction, especially since the issue here was not at issue in Johnson.
Similarly, as to the 1988 letter from the Maine Attorney General, the question was whether Maine law prohibited the use of gill nets to take about 20 Atlantic salmon, for the sole use of tribal members for their individual consumption, and not to be sold or processed for sale. The Attorney General’s answer was there was no prohibition, under section 6207(4) of the MIA (the sustenance fishing clause). The Attorney General did not purport to address whether any portion of the River was a part of the Reservation. Me. Op. Atty. Gen. No. 13 88-2 (Me. A.G.), 1988 WL 483316.

. Similarly, the dissent invokes an argument regarding the views expressed in a report commissioned by the Maine Indian Tribal-State Commission. We do not read that report as the dissent does and, in any event, the Commission's views do not displace the rules • of construction courts must follow.

. In response to the defendants' ripeness arguments, Penobscot Nation cites case law on the requirements for the Ex Parte Young exception to the Eleventh Amendment. These citations are inapposite and add nothing to the ripeness analysis.